Carlis Jovonite Russell v. The State of Texas

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-01-055-CR

CARLIS JOVONITE RUSSELL APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

OPINION

------------

I.  Introduction

A jury convicted Appellant Carlis Jovonite Russell of capital murder and assessed his punishment at life imprisonment.  The primary issue we address in this appeal is whether the trial court abused its discretion by admitting 
testimony and detailed evidence regarding an extraneous offense, the Vogt Street offense, during the State’s case-in-chief.  The Vogt Street offense was arguably relevant to prove intent, but its prejudicial effect greatly outweighed its probative value.  Accordingly, the trial court abused its discretion by admitting the Vogt Street offense during the State’s case-in-chief over the defense’s Rule 403 objection.  
See
 
Tex. R. Evid.
 403.  Because we conclude that the admission of this extraneous offense affected Russell’s substantial rights, we reverse the trial court’s judgment and remand this case for a new trial.

II.  Procedural and Factual Background

On September 3, 1997, Russell and three accomplices committed a robbery at a Fort Worth pool hall known as Fast Freddy’s.  During the robbery, Russell shot the manager of Fast Freddy’s, David Chapa, in the head and killed him.  The robbery at Fast Freddy’s and the murder of Chapa at Fast Freddy’s are collectively referred to herein as the Fast Freddy’s offense.

Russell was indicted for the capital murder of Chapa.  He pleaded not guilty, and trial commenced before a duly empaneled jury.  During its case-in-chief, the State introduced evidence concerning the Fast Freddy’s offense, as well as evidence of two extraneous offenses committed by Russell: the S&A offense and the Vogt Street offense.  The S&A offense involved the capital murder of Moayad Akhras, a convenience store clerk at the S&A Food Store.  The S&A offense occurred approximately ninety minutes before the Fast Freddy’s offense.  Russell concedes that the S&A offense was a “virtual carbon copy” of the Fast Freddy’s offense and was admissible to show identity and intent regarding the capital murder of Chapa.  The Vogt Street offense occurred on October 11, 1997, five weeks after the Fast Freddy’s offense, and  involved the burglary/robbery, sexual assault, attempted murder, and murder of two female victims.

Russell offered no evidence during the guilt-innocence phase of his trial. The jury found Russell guilty of capital murder.  Following the punishment phase of the trial, the trial court sentenced Russell to life imprisonment.

III.  The Vogt Street Extraneous Offense

In his fifth point, Russell contends that the trial court abused its discretion by admitting evidence of the Vogt Street extraneous offense in violation of Rules 404(b) and 403 of the Texas Rules of Evidence.  
See
 
Tex. R. Evid.
 403, 404(b).  In the Vogt Street offense, Russell and three accomplices entered a Fort Worth residence to commit a robbery.  One of the accomplices to the Vogt Street offense, Kevin Barnes, participated with Russell in the Fast Freddy’s offense and in the S&A offense.  During the Vogt Street offense, the robbers repeatedly sexually assaulted two women, forced them to do “nasty stuff” at gunpoint, and eventually shot both of them.  One woman was shot five times, but lived; the other woman was shot in the head and died.

Before trial started, the State sought to introduce the Vogt Street offense in conjunction with the S&A Food Store offense and the Fast Freddy’s offense in order to show that Russell and Barnes acted together as the shooters in each of these offenses and, therefore, possessed the specific intent to murder Chapa.  Russell objected, arguing that under Texas Rule of Evidence 404(b) Russell’s alleged participation in a sexual assault, robbery, and  murder was not relevant to show his intent in the Chapa murder 
five weeks earlier
, and alternatively, that under Rule 403 the prejudicial effect of the Vogt Street offense outweighed any probative value it had.
(footnote: 1)  The trial court overruled Russell’s objections and permitted the State to discuss the Vogt Street offense during opening statements.  

Later in the trial, the State articulated that it also wanted to introduce specific, detailed facts of the Vogt Street offense through the surviving victim for the purpose of showing identity.  The State argued that the Vogt Street offense tended to show identity “[n]ot because it’s a signature offense . . . but because it shows . . . that in each one of these crime scenes it’s the same two shooters:  Kevin Barnes and Carlis Russell.”  Russell’s counsel again objected, explaining that he did not believe “404(b) contemplates an exception to the general exclusionary rule based upon the association of parties here . . . to allow the introduction of all extraneous offenses because somebody’s friends with somebody or somebody runs with somebody, I don’t believe is supported by the case law and is not contemplated by 404(b).”  Russell’s counsel also objected that even if the Vogt Street offense was relevant, its probative value was nonetheless greatly outweighed by its prejudicial effect.  The trial court again overruled Russell’s objections and allowed admission of the details of the Vogt Street offense. 

A.  Standard of Review for a Determination Under Rule 404(b)

Rule 404(b) embodies the established principle that a defendant is not to be tried for collateral crimes or for being a criminal generally.  
Tex. R. Evid.
 404(b)
; Nobles v. State,
 843 S.W.2d 503, 514 (Tex. Crim. App. 1992); 
Booker v. State
, 103 S.W.3d 521, 530 (Tex. App.—Fort Worth 2003, pet. filed) (op. on reh’g); 
Curtis v. State
, 89 S.W.3d 163, 170 (Tex. App.—Fort Worth 2002, pet. ref’d). Consequently, extraneous offenses are not admissible at the guilt-innocence phase of trial to prove that a defendant acted in conformity with his character by committing the charged offense.  
Tex. R. Evid.
 404(b); 
Booker
, 103 S.W.3d at 529; 
Martin v. State,
 42 S.W.3d 196, 201 n.2 (Tex. App.—Fort Worth 2001, pet. ref’d).  An extraneous offense, however, has noncharacter- conformity relevance where it 
has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.  
Tex. R. Evid
. 401; 
Powell v. State
, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).  
That is, e
xtraneous offense evidence that tends to make more or less probable an elemental or evidentiary fact or tends to rebut some defensive theory is relevant beyond its tendency to prove a person’s character or that he acted in conformity therewith. 
Montgomery v. State
, 810 S.W.2d 372, 386-87 (Tex. Crim. App. 1991) (op. on reh'g); 
Johnson v. State
, 932 S.W.2d 296, 301 (Tex. App.—Austin 1996, pet. ref'd).  Consequently, 
evidence of other crimes or extraneous misconduct may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident.  
Tex. R. Evid.
 404(b); 
Booker
, 103 S.W.3d at 529-30. 
 
The State, as the proponent of extraneous offense evidence, bears the burden of 
showing admissibility.  
See Rankin v. State
, 974 S.W.2d 707, 
718 (Tex. Crim. App. 1998) (op. on reh’g).

The trial court’s task is to determine whether extraneous offense evidence is relevant for a purpose other than the propensity of the defendant to commit crimes or other bad acts.  
Booker
, 103 S.W.3d at 530.  Rulings on relevance should be left largely to the trial court, relying on its own observations and experience, and will not be reversed absent an abuse of discretion.  
Moreno v. State
, 858 S.W.2d 453, 463 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 966 (1993); 
Corley v. State
, 987 S.W.2d 615, 618 (Tex. App.—Austin 1999, no pet.).
  Moreover, appellate courts should give great discretion to the trial courts in matters of relevancy, reversing only if the trial court acts outside “the zone of reasonable disagreement.”  
Montgomery
, 810 S.W.2d at 391.  A trial court’s ruling on admissibility should not be disturbed simply because an appellate judge might decide a question differently than the trial judge.  
Id.
  So long as the trial court’s decision to admit or exclude evidence falls in the zone within which reasonable minds may differ, appellate courts should refrain from disturbing the trial court’s decision on appeal.  
Id.
; 
Osby v. State
, 939 S.W.2d 787, 789 (Tex. App.—Fort Worth 1997, pet. ref’d).

B.  Rule 404(b) Relevance Determination

The State asserts that the Vogt Street offense was relevant to the issues of intent and identity in the Fast Freddy’s offense.  Russell contends, however, that the Vogt Street offense was not relevant; he argues that the State impermissibly utilized the Vogt Street offense to show his character, to show he acted in conformity with that character in murdering Chapa, and to try him as a criminal generally.

1.  Intent

In a prosecution for capital murder under penal code section 19.03(a)(2), in order to convict the accused as a primary actor the State must prove and the jury must find that he "intentionally commit[ted] the murder" in the course of the underlying felony.  
Tex. Penal Code Ann
. § 19.03(a)(2) (Vernon 2003)
; Tucker v. State
, 771 S.W.2d 523, 530 (Tex. Crim. App. 1988), 
cert. denied
, 492 U.S. 912 (1989); 
Barnes v. State
, 56 S.W.3d 221, 226 (Tex. App.—Fort Worth 2001, pet. ref’d).  Moreover, before the accused may be found criminally responsible for the conduct of another who "intentionally commit[s] the murder" under the law of parties set forth in penal code section 7.02(a)(2), it must be shown the accused harbored a specific "intent to promote or assist the commission of" the intentional murder that the other committed.  
Tex. Penal Code Ann
. § 7.02(a)(2); 
Lawton v. State
, 913 S.W.2d 542, 554-55 (Tex. Crim. App. 1995), 
cert. denied
, 519 U.S. 826 (1996); 
Barnes
, 56 S.W.3d at 229.  The court of criminal appeals has held that "[o]ne could hardly indulge an intent to promote or assist in the commission of an intentional murder without, at a minimum, intending or contemplating that lethal force would be used." 
Barnes
, 56 S.W.3d at 236 (citing 
Tucker
, 771 S.W.2d at 530).

Here, the court charged the jury that if it believed from the evidence beyond a reasonable doubt that Russell:

intentionally cause[d] the death of an individual, David Chapa by shooting David Chapa with a deadly weapon, to-wit: a firearm, in the course of committing or attempting to commit the offense of robbery, you will find the defendant guilty of the offense of Capital Murder and so say by your verdict, or if you believe from the evidence beyond a reasonable doubt, that . . . Kevin Barnes or Kevin Richardson intentionally caused the death of an individual, David Chapa by shooting David Chapa with a deadly weapon, to-wit: a firearm, in the course of committing or attempting to commit the offense of robbery and the defendant, Carlis Jovonite Russell acting with the intent that the capital murder of David Chapa be committed did solicit, encourage, direct, aid or attempt to aid Kevin Barnes or Kevin Richardson to commit the offense, by carrying a weapon during the robbery, if any, by taking property from customers, if he did, by threatening customers, by removing property from the business establishment, or by firing his weapon during the robbery, if he did, then you will find the defendant, Carlis Jovonite Russell guilty of the offense of Capital Murder.

Thus, the jury was authorized to find Russell guilty if he shot Chapa in the course of the robbery at Fast Freddy’s.  
See
 
Tex. Penal Code Ann.
 § 19.03(a)(2).  The jury was also authorized to find Russell guilty under the law of parties if Kevin Barnes or Kevin Richardson shot Chapa in the course of the robbery at Fast Freddy’s and Russell, acting with the intent that capital murder of Chapa be committed, solicited, encouraged, directed, aided or attempted to aid Kevin Barnes or Kevin Richardson in committing capital murder, by carrying a weapon during the robbery, taking property from customers, threatening customers, removing property from the business establishment, or firing his weapon during the robbery.  
See id
.
 § 7.02(a)(2).

Russell asserted at trial, and asserts on appeal, that the Vogt Street offense was not relevant to show his intent with regard to the Fast Freddy’s offense because the Vogt Street offense occurred five weeks after the Fast Freddy’s offense.  At trial, the State cited three out-of-state cases indicating that subsequent extraneous offenses are admissible to show a defendant’s intent as to an earlier offense.  
See U.S. v. Germosen, 
139 F.3d 120, 128 (2
d
 Cir. 1998) (upholding admission of subsequent act under Federal Rule of Evidence 404(b) to show intent regarding charged offense and holding, “[t]he fact that the evidence involved a subsequent rather than prior act is of no moment”); 
U.S. v. Latney
, 108 F.3d 1446, 1449 (D.C. Cir.) (construing Federal Rule of Evidence 404(b) and holding that it “draws no distinction between bad acts committed before and bad acts committed after the charged offense”), 
cert. denied
, 522 U.S. 940 (1997); 
U.S. v. Olivo
, 80 F.3d 1466, 1468 (10
th
 Cir. 1996) (same).  Although these federal court decisions are not binding, when a Texas Rule of Evidence duplicates a Federal Rule of Evidence, as here, greater-than-usual deference should be given to the federal courts’ interpretations of the federal rule.  
Tamez v. State
, 11 S.W.3d 198, 201 (Tex. Crim. App. 2000).  The trial court, by overruling Russell’s objection that the Vogt Street offense was inadmissible because it occurred after the Fast Freddy’s offense, acted in accordance with the persuasive legal authorities presented to it.  
See also Santellan v. State
, 939 S.W.2d 155, 168 (Tex. Crim. App. 1997) (holding extraneous conduct subsequent to the charged offense admissible); 
Torres v. State
, 794 S.W.2d 596, 599 (Tex. App.—Austin 1990, no pet.) (same).  
Accordingly, we hold that the trial court did not abuse its discretion by rejecting Russell’s contention that the Vogt Street offense was not admissible simply because it occurred after the Fast Freddy’s offense.  
Cf. Montgomery
, 810 S.W.2d at 380 (recognizing that an abuse of discretion occurs when the trial court acts without reference to any guiding principles or rules).  

Although, based on the authorities cited by the State, the Vogt Street offense was not per se inadmissible on the ground that it occurred after the Fast Freddy’s offense, the State nonetheless 
bore the burden of establishing that the Vogt Street offense made the existence of some fact of consequence in proving the 
Fast Freddy’s offense
 more or less probable than it would be without the evidence. 
 See
 
Tex. R. Evid
. 401;
 
Rankin
, 974 S.W.2d at
 718.  The State argued: 

[T]he important point is that it [
i.e.
, the Vogt Street offense] requires the identically same intent. . . .  So, it doesn’t matter what the location is; it does matter the fact that the specific intent to kill during a robbery is illustrated by the Vogt Street crime as it is by the S&A crime and as it is in the Fast Freddy’s crime.

The State explained, “Our allegation is, it’s the same two shooters at each of these locations.  And the point is that it shows that their implied understanding of what each of them would do in each of these crimes, that is, the use—the employment of deadly force.”  Thus, the State’s argument can be summarized as follows:  because Russell and Barnes had killed before during a robbery in the S&A offense and had killed subsequently during a robbery in the Vogt Street offense, the fact that Russell and Barnes intended to kill or contemplated the use of lethal force during the Fast Freddy’s robbery is more likely.

On appeal, the State couches its argument that the Vogt Street offense is relevant to prove Russell’s intent in the Chapa capital murder as the “doctrine of chances,” citing 
Morgan v. State
, 692 S.W.2d 877 (Tex. Crim. App. 1985), 
Plante v. State
, 692 S.W.2d 487 (Tex. Crim. App. 1985),
 and 
Keller v. State
, 818 S.W.2d 425 (Tex. App.—Houston [1
st
 Dist.] 1992, pet. ref’d).
(footnote: 2)  In 
Morgan
, a pre-
Montgomery
 case, the court of criminal appeals explained that:

where the material issue addressed is the defendant’s intent to commit the offense charged, the relevancy of the extraneous offense derives purely from, the point of view of the doctrine of chances -- the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all.  Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.

Morgan
, 692 S.W.2d at 881 (citations omitted).  The 
Morgan
 court then concluded, “Before an extraneous offense is admissible to negate the possibility of accident under Wigmore’s doctrine of chances, such offense must be sufficiently similar in nature to the charged offense that the inference of improbability of accident logically comes into play.”  
Id
.  Thus, when the defendant raises the issue of accident or mistake, extraneous offense or bad acts evidence may be admissible under the doctrine of chances because it tends to make an accident or mistake 
less probable and tends to make the fact that the defendant intended the act more probable.  
Montgomery
, 810 S.W.2d at 386-87; 
see also Dowler v. State
, 777 S.W.2d 444, 447-48 (Tex. App.—El Paso 1989, pet. ref’d) (holding extraneous offenses of murder by cyanide poisoning relevant to charge of murder by chloroform poisoning).

The doctrine of chances, however, does not support the admissibility of the Vogt Street offense in the present case.  
In 
Morgan
, 
Plante
, 
and 
Keller
,
 each defendant either raised the issue of accident or mistake, or the defendant’s conduct was as consistent with accident as with a specific intent.  
See Morgan
, 692 S.W.2d at 881 (holding extraneous acts of touching of complainant and her friend were admissible in indecency with a child prosecution because defendant’s charged conduct was as consistent with accident as with a specific lascivious intent); 
Plante
, 692 S.W.2d at 490, 492-94 (holding defendant’s extraneous acts of nonpayment for sale, lease, or loan of goods and services were admissible in prosecution for theft by deception because defendant’s intent could not be inferred from his nonpayment in the charged offense); 
Keller
, 818 S.W.2d at 429 (holding defendant’s extraneous acts of nonpayment for goods and services were admissible in prosecution for theft of service because defendant’s intent could not be inferred from his nonpayment in the charged offense).  Here, Russell never contended that either he or Barnes accidently or mistakenly shot Chapa.  Rather, through cross-examination of the State’s witnesses, Russell raised the issue of whether Ray Williams, who drove the getaway car from the Fast Freddy’s offense, was in fact the person who shot Chapa.

Here, Dr. Marc Andrew Krouse, Deputy Chief Medical Examiner, testified that Chapa was killed by a single gunshot wound to the back of his head.  The gun was placed very close to the back of Chapa’s head—a few inches to about a foot or foot and a half—because gun powder residue and stippling were present on Chapa’s scalp around the entrance wound made by the bullet.  The record before us contains no evidence that Russell or Barnes accidently or mistakenly shot Chapa.  The gun firing the bullet that killed Chapa was mere inches to perhaps a foot and a half from the back of Chapa’s head; whoever pulled the trigger definitely intended to kill Chapa.
  Nor is the shooting of Chapa as consistent with an accident as it is with a specific intent to kill.

Finally, even under the doctrine of chances, the State may not introduce extraneous offenses as circumstantial evidence of an element in its case-in-chief if that element can readily be inferred from other uncontested evidence.  
Clark v. State
, 726 S.W.2d 120, 122 (Tex. Crim. App. 1987) (op. on reh’g); 
DeLeon v. State
, 77 S.W.3d 300, 312 (Tex. App.—Austin 2001, pet. ref’d).  
That is, where the State’s evidence clearly shows the intent element of the crime and that evidence is uncontradicted by the defendant or not undermined by cross-examination of the State’s witnesses, the offer of other crimes is unjustified. 
See Morgan
, 692 S.W.2d at 882 n.3.

Here, the State possessed other evidence of Russell’s specific intent to kill Chapa.  Kendra Stephens, a witness to the Fast Freddy’s offense, identified Russell from a photo-lineup as the gunman who shot Chapa.  She testified that the gunman had “puff balls” in his hair, wore Jump Man tennis shoes, and yelled at her friends LaShonda and Tamara, two Fast Freddy’s patrons, to “shut up” and stop screaming or “I’ll kill you.”  Russell was wearing Jump Man shoes when he was arrested.  

Kevin Richardson testified that he was in a car with Barnes and Russell and driven by Williams when Barnes and Russell exited the car with guns to rob the S&A Food Store.  Barnes had a .380 caliber gun and Russell had a .9 millimeter gun.  Barnes and Russell entered S&A Food Store, Richardson heard two gun shots, and then Barnes and Russell came running back to the car, arguing over who had shot Akhras.  Richardson said that as they were driving Barnes home after the S&A offense, Russell told Williams to pull into an apartment complex because they were going to rob Fast Freddy’s, located across the street.  

Russell, with his .9 millimeter, Barnes, with his .380, and Richardson entered Fast Freddy’s.  Barnes went to the back, behind the bar, got the money, and ran out.  Russell then went behind the bar, and Richardson heard a shot.  Russell then came running out of Fast Freddy’s.  Russell indicated that he shot Chapa because Chapa had looked at him.

Samuel Bridgett testified that he met Russell through Kevin Richardson, who is his cousin by marriage.  Bridgett testified that Russell admitted shooting “a guy” during the Fast Freddy’s offense “because he was looking at him.” 

Robert Adkins, a firearms examiner with the Fort Worth Police Department, testified that he examined evidence found at both the S&A offense and the Fast Freddy’s offense.  He testified that two firearms were fired at the S&A offense: a .380, firing Remington .380 automatic bullets, and a .9 millimeter, firing Fiocchi .9 millimeter bullets and/or full metal jacket bullets.  A Fiocchi .9 millimeter casing was found at Fast Freddy’s, and it was fired from the same gun as the Fiocchi .9 millimeter casing found at S&A Food Store.

Russell contends that the State conceded it had ample evidence of Russell’s specific intent to kill in the Fast Freddy’s offense when the prosecutor made the following closing argument:

I want you to go back and think about what this Defendant was saying to those women and those individuals in that back room when he was pointing a gun on him -- them.  Using phrases, quote, unquote, “Bitch, don’t move or I’ll shoot you.  I will kill you.  I will shoot you.  Give me your money and I will kill you.”  Each of those statements go to his intent, his intent to kill, whether as a party or as the shooter himself.

Russell also points out that in addition to the testimony of witnesses to the Fast Freddy’s offense concerning his statements during the robbery, the State proved up the S&A offense to establish his specific intent in the capital murder of Chapa.  The record before us contains ample evidence, as well as the S&A extraneous offense, to prove Russell’s specific intent to kill Chapa.  For these reasons, we cannot agree with the State’s contention that the Vogt Street offense was relevant to prove Russell’s intent by virtue of the application of the doctrine of chances.

Nonetheless, deferring as we must to the trial court’s reliance on its own observations and experience in making a Rule 404(b) relevancy determination, 
we cannot say that the trial court abused its discretion by concluding that the Vogt Street offense bore some relevance to the issue of Russell’s specific intent in the capital murder of Chapa.  
See, e.g., Bradshaw v. State
, 65 S.W.3d 232, 237 (Tex. App.—Waco 2001, no pet.) (holding extraneous acts relevant to show intent in charged offense).
  
The court’s charge authorized the jury to convict Russell under the law of parties if, 
acting with the intent that the capital murder of David Chapa be committed
, Russell solicited, encouraged, directed, aided, or attempted to aid Barnes or Richardson in the murder of Chapa.  The Vogt Street offense makes 
more probable Russell’s specific intent in Chapa’s capital murder if the jury believed that Russell himself did not shoot Chapa, but was guilty as a party.  
That is, as the State contends,
 Russell’s specific intent to kill during the Fast Freddy’s offense is more probable because the Vogt Street offense and the S&A offense, involving the same shooters as the Fast Freddy’s offense, shows the shooters’ implied understanding and consent to the use of deadly force by the others during these robberies.  
See
 
Barnes
, 56 S.W.3d at 229.  
We hold that the trial court’s implied determination that the Vogt Street offense was relevant to show Russell’s intent in the Fast Freddy’s offense falls at least within the zone of reasonable disagreement.  
See Montgomery
, 810 S.W.2d at 391.

2.  Identity

The State also asserts that the Vogt Street offense was relevant to establish Russell’s identity in the Fast Freddy’s offense.  The State did not offer the Vogt Street offense as a signature offense, however, but argued that it tended to show identity “because it shows . . . that in each one of these crime scenes [S&A offense, Fast Freddy’s offense, and Vogt Street offense] it’s the same two shooters:  Kevin Barnes and Carlis Russell.”  Thus, the State’s argument centers on the theory that because identical participants were involved as shooters, the Vogt Street offense tends to show identity in the Fast Freddy’s offense.  Russell again, however, contends that the Vogt Street offense was used to show character conformity in violation of Rule 404(b). 

Identity is an “elemental fact” in every criminal case with relevance apart from character conformity.  
Montgomery
, 810 S.W.2d at 387.  When identity is an issue in the case, evidence of an extraneous offense may be admissible to show identity.  
Lane v. State
, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996); 
Avila v. State
, 18 S.W.3d 736, 739 (Tex. App.—San Antonio 2000, no pet.).  Typically, to be relevant to the issue of identity, extraneous offenses must share multiple common characteristics, or the device used in each offense must be so usual and distinctive as to be like a signature.  
See, e.g.
, 
Taylor v. State
, 920 S.W.2d 319, 322 (Tex. Crim. App.),
 cert. denied
, 519 U.S. 951 (1996).  That is, “to be admissible to show identity, an extraneous offense must be so similar to the charged offense as to 
mark
 the offenses as the defendant’s handiwork.”  
Johnson v. State
, 68 S.W.3d 644, 650-51 (Tex. Crim. App. 2002) (emphasis added).

We have located no case law authority for the proposition that a defendant’s association with another to commit prior and subsequent offenses makes his identity as the perpetrator of the present offense along with the other person more probable.  The Vogt Street offense raises only a suspicion as to identity in the Fast Freddy’s offense that culminates from the association of Barnes and Russell.  
Accord Wincott v. State
, 59 S.W.3d 691, 700-01 (Tex. App.—Austin 2001, pet. ref’d) (holding suspicion that some combination of individuals participated in five robberies was insufficient to corroborate accomplice testimony).  “[G]uilt by association [is] one of the most odious institutions of history . . . .  Guilt under our system of government is personal.” 
Id
. (quoting 
Joint Anti-Fascist Refugee Comm. v. McGrath
, 341 U.S. 123, 178, 71 S. Ct. 624, 652 (1951)).  Any determination that Russell’s identity in the Fast Freddy’s offense was more probable because of Russell’s subsequent association with Barnes in the Vogt Street offense constituted an abuse of discretion because it authorized an inference of guilt by association, that is, an inference that because Russell acted with Barnes in the Vogt Street offense, he also was the person who acted with Barnes in the Fast Freddy’s offense.  
See
 
generally
 
Tex. R. Evid.
 404(b) (prohibiting the use of extraneous offenses to prove character and subsequent conduct in conformity with that character); 
Ford v. State
, 484 S.W.2d 727, 729 (Tex. Crim. App. 1972) (holding that extraneous offense evidence must be relevant on some theory other than the general proposition that one who commits one crime is prone to commit another).  The Vogt Street offense was not relevant to prove Russell’s identity in the Fast Freddy’s offense and to the extent the trial court admitted the Vogt Street offense on this basis, it abused its discretion.

C.  Standard of Review for Trial Court’s Rule 403 Determination

Having determined that whether the Vogt Street offense was relevant to Russell’s intent in the Fast Freddy’s offense is at least within the “zone of reasonable disagreement,” we next review whether the trial court abused its discretion by overruling Russell’s Rule 403 objection.  If a trial court determines that evidence of other crimes or extraneous misconduct has relevance aside from character conformity, and a timely, proper Rule 403 objection is made, the trial court must make a balancing determination under Rule 403.  
Montgomery,
 810 S.W.2d at 388-89.  Rule 403 provides that “[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.”  
Tex. R. Evid.
 403.  Only “unfair” prejudice provides the basis for exclusion of relevant evidence.  
Montgomery,
 810 S.W.2d at 389.  Unfair prejudice arises from evidence that has an undue tendency to suggest that a decision be made on an improper basis, commonly an emotional one.  
Id.  
A presumption exists that relevant evidence will be more probative than prejudicial.  
DeLeon
, 77 S.W.3d at 315.  In evaluating the trial court’s determination under Rule 403, a reviewing court is to 
reverse the trial court’s judgment “rarely and only after a clear abuse of discretion,” recognizing that the trial court is in a superior position to gauge the impact of the relevant evidence. 
Mozon v. State,
 991 S.W.2d 841, 847 (Tex. Crim. App. 1999); 
Montgomery,
 810 S.W.2d at 389; 
Curtis
, 89 S.W.3d at 170. 

The trial court’s balancing determination must be measured against the relevant criteria by which a Rule 403 decision is made.  
Mozon,
 991 S.W.2d at 847.  The relevant criteria in determining whether the prejudice of an extraneous offense substantially outweighs its probative value include:  (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense; (2) the potential the other offense evidence has to impress the jury “in some irrational but nevertheless indelible way”; (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the force of the proponent’s need for this evidence to prove a fact of consequence, that is, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.
  Id
. (citing 
Montgomery
, 810 S.W.2d at 389-90).  When the relevant criteria are viewed objectively and lead to the conclusion that the danger of unfair prejudice substantially outweighs the probative value of the proffered evidence, the appellate court should declare that the trial court erred in failing to exclude it. 
Curtis
, 89 S.W.3d at 170 (citing 
Montgomery
, 810 S.W.2d at 392).

D.  Rule 403 Balancing Test

Russell argues that the trial court abused its discretion by admitting evidence of the Vogt Street offense under Rule 403 because there was little evidence connecting him to the Vogt Street offense and the prejudicial effect of the Vogt Street offense evidence was substantial.  He further argues that the offense was distinctly dissimilar to the Fast Freddy’s offense, that the State devoted a significant amount of time to developing evidence regarding the offense, and that the State did not have the “slightest need” for the offense in light of the facts surrounding the Fast Freddy’s offense and the S&A Food Store extraneous offense, which Russell admits was admissible as a “virtual carbon-copy” of the Fast Freddy’s offense.

1.  Factor One—Degree of Relevance and Strength of Evidence

Applying the Rule 403 balancing factors set out in 
Montgomery,
 we first examine how compelling the Vogt Street offense is of Russell’s intent in the Fast Freddy’s offense.  In performing this review, we also examine the strength of the evidence connecting Russell to the Vogt Street offense.  The surviving victim of the Vogt Street offense testified that a few days before the offense, a man named Myron Nash, whose nickname was “Big O,” came to her house, along with two other men, to drop off some property for her to store.  She positively identified Russell as one of the two men who accompanied Nash.

With respect to the Vogt Street offense, however, the surviving victim could not identify Russell as being one of the participants involved in the offense.  She testified that all of the robbers wore blue bandanas that covered their faces from the nose down.  She provided a detective with only “general descriptions” and nothing that led him to identify any suspects.  Additionally, no DNA evidence or other physical evidence linked Russell to the offense. However, the surviving victim’s testimony about the specifics of the offense was corroborated by Tonero Rainey and Andre Edwards.

Rainey, who is a relative of Russell’s, testified that, on October 9, 1997, he, Myron Nash or “Big O,” and Russell went to the Vogt Street residence and dropped off some weapons.  He and Russell drove there in his vehicle, a 1978 Cadillac, which he identified in State’s exhibit 22.  State’s exhibit 22, a picture taken by police at the time they were investigating the October 11th Vogt Street offense, showed Rainey’s vehicle parked in the driveway at the Vogt Street residence.  Rainey further testified that, while he and Russell were in jail, Russell told him about the Vogt Street offense.  Russell told him they had gone there looking for “Big O” and had asked the girls where the weapons were, but they did not know.  Russell then told him that one of the girls started screaming, so he shot her in the head.

Edwards testified that he is Christopher Hill’s cousin and that he knows Russell.  He stated that, on October 11, 1997, while he was staying at Kevin Barnes’s house, Hill came over with Deangus Wright and another individual because Hill wanted to “hit a lick,” which is a term for making some money illegally.  Barnes, Hill, and Wright then began talking about looking for “Big O” because he had taken their guns.  They called Russell and told him they were going to get “Big O.”  The group then prepared to go out by gathering masks and guns, but Edwards did not go with them.  Later that evening, Barnes, Hill, Wright, and Russell awakened Edwards by knocking on the door to his aunt’s house where he was staying, which was “right across down the street from that Fast Freddy’s.”  Edwards testified that Barnes told him they had “killed the girls,” had “made ‘em do a lot of nasty stuff,” and that Russell made them perform sexual acts.  Barnes told him that Russell had told him to “[s]hoot ‘em” and that “he shot ‘em in the booty,” but that his gun jammed, so Russell shot one woman in the head.  Barnes also told him that Hill and Russell shot the other girl.  Barnes stated he could “hear them screaming in his head.”  Edwards testified that Russell was present when Barnes made these statements and that Russell did not say anything, but was just “sitting there like he was okay with it.”  Edwards later testified that Russell told him that he shot the deceased Vogt Street victim “[b]ecause she was screaming,” and that when he asked Russell how he could do that kind of thing, Russell responded that “[a]fter you kill so many people, it doesn’t matter no more.”

DNA evidence corroborated Edwards’s testimony.  Although no DNA evidence linked Russell to the Vogt Street offense, DNA evidence did link Barnes, Hill, and Wright to the offense.

Thus, the evidence at trial did tend to connect Russell to the Vogt Street offense, specifically as one of the shooters along with Barnes.  This evidence serves to make the issue of Russell’s intent in the Fast Freddy’s offense slightly more probable, weighing in favor of its admission.  
See Montgomery, 
810 S.W.2d at 394 (holding evidence of extraneous acts—that father walked around nude with erection in front of children—was relevant to issue of intent in father’s prosecution for indecency with a child although probative value of such evidence was outweighed by its prejudicial effect).  We, therefore, conclude that the first 
Montgomery
 factor weighs very slightly in favor of the admissibility of the Vogt Street extraneous offense to prove Russell’s intent as the primary actor or as a party to Chapa’s capital murder.

2.  Factor Two—Irrational, Indelible Impression

The second 
Montgomery
 factor, the potential of the extraneous offense evidence to impress the jury “in some irrational but nevertheless indelible way,” here weighs heavily in favor of exclusion of the Vogt Street offense.  
See Taylor v. State, 
93 S.W.3d 487, 504, 506-07 (Tex. App.—Texarkana 2002, pet. ref’d) (holding trial court abused its discretion under Rule 403 by admitting despicable story written by defendant about “sex enjoyed by men and women with both willing and unwilling young girls” in prosecution for possession of child pornography); 
Manning v. State
, 84 S.W.3d 15, 23 (Tex. App.—Texarkana 2002, pet. granted) (holding trial court abused its discretion under Rule 403 by admitting evidence of cocaine metabolite in defendant’s bloodstream in prosecution for vehicular manslaughter where evidence established metabolite has no cocaine-like effects and no evidence existed defendant was under influence of cocaine at time of accident).  In 
Montgomery
, the court of criminal appeals reversed the Dallas Court of Appeals for upholding the trial court’s determination that evidence that the appellant walked around naked, with an erection, in front of his children was more probative than prejudicial in appellant’s prosecution for indecency with a child.  810 S.W.2d at 397.  Specifically, the court of criminal appeals explained:

Though relevant, such evidence has only marginal probative value. By contrast, the danger of unfair prejudice from such testimony is substantial.  Both sexually related misconduct and misconduct involving children are inherently inflammatory.  Many in our society would condemn appellant for his conduct whether they believed it showed sexual arousal directed at his children, an undifferentiated sexual arousal imprudently displayed, or simply an incidental erection coupled with a damnable nonchalance.  In any event there was a grave potential for decision on an improper basis, as jurors may have lost sight of specific issues they were called upon to decide and convicted appellant out of a revulsion against his parental demeanor.

Id.

Here, the testimony regarding the Vogt Street offense revealed that both the victims were held at gunpoint by four robbers; were repeatedly orally, anally, and vaginally assaulted over an extended length of time; were forced to perform oral sex on at least one of the perpetrators and on each other; were stripped of their clothing and forced to crawl on their hands and knees through the residence; and were ultimately shot.  The Vogt Street extraneous offense involved not only inherently inflammatory sexually related misconduct but a horrifying nightmare told emotionally—demonstrated by “(weeping)” parentheticals in the reporter’s record—by a victim of this terror.

Additionally, the trial court admitted into evidence a number of exhibits relating to the offense, including seven photographs of the deceased victim. Two of these seven photographs are particularly gruesome, showing the victim’s nude body—one lying face-up and the other face-down—at the crime scene.  The State introduced both of these photographs early in its presentation of evidence of the Vogt Street offense and published them to the jury on a television screen.  Of the remaining photographs, two showed close-ups of the victim’s head, again one face-up and the other face-down; the others, which were taken by the medical examiner, depicted close-ups of the victim’s gunshot wounds to the head and buttocks and showed a close-up of the victim’s face. The surviving victim’s graphic, minute-by-minute description of the events at the Vogt Street residence—the words that were said, hearing her best friend shot in the other room, and her terror during these events—as well as the shocking photographs of the deceased victim, is simply not the type of evidence that can be filed away in some compartment of the mind and considered for only a limited purpose.  
See Taylor
, 93 S.W.2d at 506; 
Montgomery, 
810 S.W.2d at 397 (recognizing that limiting instruction “would not likely have neutralized the danger” that the jury would lose sight of the specific issues they were to decide); 
Hilliard v. State
, 881 S.W.2d 917, 920 (Tex. App.—Fort Worth 1994, no pet.).  Although the trial court instructed the jury that it was not to consider the extraneous offenses except for purposes of intent and identity, the heinous nature of the Vogt Street offense and the emotionally-charged testimony of the surviving victim was likely to create such great prejudice in the minds of the jury that it would have been unable to limit its consideration of the Vogt Street offense evidence to its proper purpose of showing Russell’s intent in the Fast Freddy’s offense.  
See Curtis
, 89 S.W.3d at 176 (noting jury was likely to draw impermissible character conformity inference from extraneous sexual offense and that extraneous offense evidence invited the jury to convict defendant on a moral or emotional basis).  The evidence concerning the Vogt Street offense invites the jury to convict Russell based on outrage at his conduct in the Vogt Street offense and based on sympathy for the surviving victim of that offense.  The Vogt Street offense is more heinous than the Fast Freddy’s offense and very likely impressed the jury in some indelible way to convict Russell based on the Vogt Street offense, instead of for the Fast Freddy’s offense.  The second 
Montgomery
 factor weighs strongly in favor of exclusion of the Vogt Street extraneous offense.

3.  Factor Three—Time Needed

The third 
Montgomery
 factor, the time the proponent needs to develop the extraneous offense evidence, during which the jury is distracted from consideration of the charged offense, also weighs in favor of exclusion of the Vogt Street extraneous offense.
  
The State spent a significant amount of time presenting evidence of the Vogt Street offense.  The State first mentioned the offense during its opening statement.
(footnote: 3)  The State then introduced evidence of the offense through the testimony of twelve witnesses, including the above-referenced, emotionally-charged testimony of the surviving victim.  The State offered, as explained above, numerous exhibits concerning the Vogt Street offense.  The State also referred to the offense several times during closing arguments.
(footnote: 4)
 Our review of the record reveals that a little more than 200 pages out of approximately 682 pages of testimony, or about thirty percent of the trial, was devoted to the Vogt Street offense.  By way of contrast, about 350 pages of the trial testimony was devoted to proving the charged offense, and about 130 pages of trial testimony was devoted to the S&A offense.  Given the significant amount of time devoted to the Vogt Street offense and the amount and nature of the testimony and evidence adduced with regard to the offense, we conclude that the third 
Montgomery
 factor weighs in favor of exclusion of the Vogt Street extraneous offense.  
See Booker, 
103 S.W.3d at 521 (noting third 
Montgomery
 factor weighed in favor of excluding extraneous offense when trial time spent proving extraneous offense exceeded time spent proving charged offense); 
Manning
, 84 S.W.3d at 23-24 (noting third 
Montgomery
 factor weighed in favor of excluding extraneous offense when one-fifth of trial time was spent proving extraneous offense).

4.  Factor Four—State’s Need

Finally, we consider the fourth 
Montgomery
 factor, the State’s need for the extraneous offense evidence.  Evidence of the extraneous offense must be given less weight if the State’s intent evidence is strong.  
See Montgomery,
 810 S.W.2d at 390 (stating that “[w]hen the proponent has other compelling or undisputed evidence to establish the proposition or fact that the extraneous misconduct goes to prove, the misconduct evidence will weigh 
far less than it otherwise might
 in the probative-versus-prejudicial balance”) (emphasis added). The State may not introduce extraneous offenses as circumstantial evidence of an element in its case-in-chief if that element can readily be inferred from other uncontested evidence.  
DeLeon
, 77 S.W.3d at 312 (citing 
Clark
, 726 S.W.2d at 122).  As shown below, the State had no need for the Vogt Street offense because ample evidence exists concerning Russell’s intent in the Fast Freddy’s offense.

a.  Intent Evidence From Fast Freddy’s Offense

At trial, Stevens testified that Russell was the man who robbed her and her friends at gunpoint in one of the back rooms of Fast Freddy’s.  During the course of the robbery, she heard Russell tell her friends:  “Bitch, shut up.  Bitch, shut up.  I’ll kill you.”  After taking some items from them, Russell then ran out of the back room and jumped over the bar, going behind the bar.  She next heard him tell one of the female employees behind the bar:  “Bitch, shut up screaming.  Bitch, I’ll kill you.”  She then heard a gunshot.  Stevens’s friends, Tamara Prince and LaShonda Barksdale, also testified, corroborating much of Stevens’s testimony about the robbery.

Ramona Crabtree, a Fast Freddy’s employee, testified that she was behind the bar and that Chapa was in the office when a black man with a gun jumped over the bar and demanded money.  She said the man pointed a gun at them and told them not to look at him.  Chapa told the man to take everything in the safe and pushed her down to the ground.  She heard something that “sounded like it hit a tin can, and [her] ears were ringing.”  When she tapped and pushed on Chapa, he fell over and she saw that he was “bleeding everywhere.”

Kevin Richardson, a convicted accomplice in the S&A offense, testified that he, Russell, and others went out on September 2, 1997 to rob a store.  He stated that, after the S&A offense, Russell decided they were going to rob Fast Freddy’s.  At Russell’s instruction, Richardson first went into Fast Freddy’s and got some change to determine if any police were present.  He then acted as a lookout, holding the door while Russell and Barnes went in to rob the place.  He testified that Russell wore a blue rag over his face, had a .9 millimeter gun, and went into where the pool tables were located.  Barnes had a .380 caliber gun, went behind the bar, got the money, and ran out.  Russell then went behind the bar, and Richardson heard a gunshot.

Andre Edwards’s testimony about the Fast Freddy’s offense also tended to corroborate that of Stevens, Prince, and Barksdale.  Edwards testified that Barnes told him that he, Richardson, and Russell had robbed Fast Freddy’s and had “killed a dude,” that the “dude tried to run and they had shot him in the back and killed him.”

Samuel Bridgett testified that he knew Russell through Richardson, who was his cousin, and that Russell told him about the Fast Freddy’s offense and the S&A offense.  Russell told him that they went into each place, “pointed the gun and started shooting,” and that they robbed Fast Freddy’s. 

The above testimony from numerous individuals provided probative evidence that Russell specifically intended the capital murder of Chapa, whether he was acting as a party or as the shooter.  Russell’s counsel did, however, attack much of this testimony on cross-examination and in closing arguments. Specifically, counsel attacked Stevens’s testimony based on some inconsistencies between her trial testimony and her statements to police; the fact that she identified Russell, even though she never saw his full face; and her prior criminal history for credit card abuse.  Counsel also sought to impeach Richardson’s testimony on the basis of his lies to police and the plea bargain agreement he received in exchange for testifying against Russell.  Counsel similarly attacked Edwards’s testimony based on the deal he struck with the State. While counsel also sought to impeach Prince’s and Barksdale’s testimony, he did not attempt to attack the testimony given by Bridgett or Rainey.  Although the defense brought out conflicting and impeachment evidence via cross-examination, this evidence had little or no bearing on the issue of Russell’s intent in the Fast Freddy’s offense.  
Cf. Siqueiros v. State
, 685 S.W.2d 68, 71 (Tex. Crim. App. 1985) (recognizing cross-examination of State’s witnesses can raise issue of identity).  The State provided probative evidence on the issue of Russell’s intent in the Fast Freddy’s offense through numerous witnesses, and this evidence of intent was not seriously undermined by the defense.  
Accord DeLeon
, 77 S.W.3d at 313-14 (holding defense cross-examination did not raise issue of intent or identity).

b.  Evidence of S&A Offense

The State also presented evidence of the S&A offense, which as Russell admits and the evidence shows, was a near “carbon copy” of the Fast Freddy’s offense.  Both occurred within a few hours of each other; both occurred at commercial establishments; and both involved two masked gunmen, robbery, and murder.  The S&A offense factored heavily on the issues of both intent and identity in the Fast Freddy’s offense.

Both Richardson and Edwards also testified about the S&A offense. Richardson testified that Russell and Barnes got out of the car with blue rags over their faces and two guns; Russell had a .9 millimeter, and Barnes had a .380 caliber gun.  Both entered the store, after which he heard two gunshots.  Russell and Barnes then came running back to the car and began arguing over who had shot the store clerk.

Edwards testified that, in Russell’s presence, Barnes told him that he and Russell may have killed somebody at the S&A Food Store and that they had to throw the gun away.  Two other witnesses, an employee and a customer who were in the store at the time of the offense, testified that there were two black gunmen who wore masks on their faces.  Both testified to hearing shots fired. As previously mentioned, the State’s firearms examiner testified that he examined bullets and casings found at both S&A Food Store and Fast Freddy’s. He concluded that the .9 millimeter used in the S&A offense was also fired during the Fast Freddy’s offense.  Therefore, the State’s evidence showed a strong correlation between the S&A offense and the Fast Freddy’s offense, providing both intent and identity evidence in the Fast Freddy’s offense and eliminating the need for the Vogt Street offense.

c.  No Need for Vogt Street Offense

The evidence outlined above shows that the State’s evidence of Russell’s intent in the Fast Freddy’s offense was strong; therefore, the need for the extraneous Vogt Street offense was minimal at best.  
See Montgomery,
 810 S.W.2d at 390; 
Graff v. State
, 65 S.W.3d 730, 740 (Tex. App.—Waco 2001, pet ref’d) (holding, “[T]he State did not need this evidence” [of possession of 147 boxes of cold pills used to manufacture methamphetamine] because the State had other convincing evidence to establish the defendant’s intent to deliver methamphetamine).  The State’s evidence showing Russell’s intent was compelling, particularly in light of the S&A offense and the ballistics evidence linking that offense to the Fast Freddy’s offense.  The Vogt Street offense added very little to the overall evidence of Russell’s intent during the Fast Freddy’s offense.  
See Booker
, 103 S.W.3d at 534.

Finally, the State’s lack of need for the Vogt Street offense is demonstrated in the State’s closing arguments.  The State argued:

You know, you might say you go into a robbery, you were in a robbery, like we discussed, and my partner on his own initiative shoots somebody and I don’t know anything about it.  And maybe you can get a jury to buy that.  But you’re not going to get them to buy it when the facts are that you were an hour before right with me before and I shot someone at that store.  Then you just can’t claim you didn’t know.

This argument by the State demonstrates why the S&A offense alone accomplished what the State claims it needed the Vogt Street offense to accomplish.  
See Reese v. State, 
33 S.W.3d 238, 242 (Tex. Crim. App. 2000) (holding fourth 
Montgomery
 factor weighed heavily in favor of exclusion of inflammatory picture when State had other noninflammatory pictures that would have served the same purpose).

Although the State claimed it needed the Vogt Street offense to establish Russell’s intent in the Fast Freddy’s offense, the State contended in closing argument that the evidence in the case was “overwhelming” and that there was “so much evidence . . . that [Russell] killed David Chapa either as a party or as the shooter.”  Additionally, the State argued that Richardson’s testimony, as an accomplice in both the S&A and Fast Freddy’s offenses, and the corroborating evidence was “enough to . . . return a verdict of guilty to capital murder.”  In fact, the State spent most of its closing argument referencing the Fast Freddy’s offense and the S&A offense and addressing the similarities between those two offenses and the substantial amount of evidence showing that Russell participated in those crimes as either a party or a shooter.  The evidence, indeed, supports the State’s assertions.  We conclude that the fourth 
Montgomery
 factor weighs heavily in favor of exclusion of the Vogt Street extraneous offense.

Affording all due deference to the trial court’s Rule 403 decision, our review of the record and the relevant criteria under Rule 403 demonstrates that the very low probative value of the Vogt Street offense on the issue of Russell’s intent in the Fast Freddy’s offense is overwhelmingly outweighed by the extremely inflammatory nature of the Vogt Street offense evidence. Accordingly, we hold that the trial court abused its discretion in admitting evidence of the Vogt Street extraneous offense.  
See Montgomery, 
810 S.W.2d at 392-93.

E.
  
Harm Analysis

Error under the rules of evidence in the admission of evidence constitutes nonconstitutional error.  
See Johnson v. State,
 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  A reviewing court is to disregard nonconstitutional error that does not affect the substantial rights of the defendant.  
Tex. R. App. P.
 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State
, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing 
Kotteakos v. United States,
 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  In 
Kotteakos,
 the United States Supreme Court explained:

[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment 
was not substantially swayed
 by the error, it is impossible to conclude that substantial rights were not affected.  The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had 
substantial influence.
  If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 765, 66 S. Ct. at 1248 (emphasis added); 
see also Motilla v. State,
 78 S.W.3d 352, 355-58 (Tex. Crim. App. 2002); 
Johnson v. State,
 43 S.W.3d 1, 4 (Tex. Crim. App. 2001).

The Supreme Court has defined “grave doubts” to mean “in the judge’s mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.”  
Webb v. State,
 36 S.W.3d 164, 182-83 (Tex. App.—Houston [14
th
 Dist.] 2000, pet. ref’d) (op. on reh’g) (citing 
O’Neal v. McAninch,
 513 U.S. 432, 435, 115 S. Ct. 992, 994 (1995)).  If the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, that is, as having a substantial and injurious effect or influence in determining the jury’s verdict.  
Id.

The defendant is not required to prove harm from an error.  
Johnson,
 43 S.W.3d at 4.  Indeed, there ordinarily is no way to prove “actual” harm.  
Id.
  It is instead the duty of the reviewing court to assess harm from the context of the error.  
Id.
  Thus, the proper inquiry is whether the trial court’s error in allowing the State to introduce evidence of the Vogt Street extraneous offense substantially swayed or influenced the jury’s verdict, or whether we are left in grave doubt as to whether this extraneous offense evidence substantially swayed or influenced the jury’s verdict.  
See Kotteakos,
 328 U.S. at 765, 66 S. Ct. at 1248; 
Johnson,
 43 S.W.3d at 4.  In making this determination, we consider the trial court’s erroneous admission of the extraneous offense evidence in the context of the entire record and not just whether there was sufficient or overwhelming evidence of the defendant’s guilt.  
See
 
Motilla,
 78 S.W.3d at 355-56.  As stated in 
Harris v. State
:

[A] reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial.  Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. . . .
 If the error was of a magnitude that it disrupted the [jurors’] orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted.  Again, it is the effect of the error and not the other evidence that must dictate the reviewing court’s judgment.

790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989).

Here, the record reveals that the State spent nearly one-third of the trial proving up the Vogt Street offense, an “inherently inflammatory” extraneous offense.  
See Montgomery,
 810 S.W.2d at 397; 
DeLeon
, 77 S.W.3d at 316. Twelve witnesses—including five police officers, a fingerprint expert, a firearms examiner, the deputy chief medical examiner, three acquaintances of Russell, and the surviving victim—testified about the offense.  Four of these witnesses, including the surviving victim, testified in depth regarding the emotionally-charged and gruesome details of the offense.  Additionally, the trial court admitted into evidence seven photographs of the deceased; two of the pictures showed the victim’s nude body at the scene of the offense.  In contrast, while there were sixteen witnesses that testified about the primary offense and eleven witnesses who testified about the S&A offense, only three photographs of Chapa and four photographs of Akhras were admitted into evidence.

Although the State did not spend a substantial amount of time during its closing argument on the Vogt Street offense, the record shows that the State did refer to it several times, emphasizing at one point the sexual aspect of the offense.  The State’s comments in this regard appear calculated to prejudice the jury against Russell by casting him as the one who was “in charge” of the sexual assaults of the two victims.  Specifically, the State commented:

In the first place, [Russell] was in charge of the evening entertainment where the girls were made to have sex with each other.  
That’s the kind of man he is.
  So his DNA didn’t show up there.  He was in charge of forcing one of them to give him oral sex . . . who was shot, critically wounded five times, went to the hospital after vomiting.  So you wonder why his DNA didn’t show up?  I suggest to you, you know why.  [Emphasis added.]

The sexual assault aspect of the Vogt Street offense had nothing in common with either the Fast Freddy’s offense or the S&A offense, and the State’s emphasis on this aspect of the offense, albeit short, clearly invited the jury to convict Russell for being “the kind of man” who would commit the heinous acts comprising the Vogt Street offense.

The evidence in the record before us supports Russell’s conviction for the capital murder of Chapa.  But evidence of guilt, even overwhelming evidence of guilt, is only one of the factors we are to consider in conducting a Rule 44.2(b) harm analysis.  
Motilla,
 78 S.W.3d at 356-57.  Extraneous offense evidence can have a devastating impact on the jury’s rational disposition towards other evidence because of the jury’s natural inclination to infer guilt to the charged offense from the extraneous offenses.  
Abdnor v. State,
 871 S.W.2d 726, 738 (Tex. Crim. App. 1994)
; see also Mayes v. State,
 816 S.W.2d 79, 86 (Tex. Crim. App. 1991)
. Here, the erroneous admission of the Vogt Street offense—the detailed, emotional testimony of the surviving victim, the photographs of the deceased victim, and the testimony of Russell’s accomplices concerning his role in the offense—was of such a magnitude that in all probability it disrupted the jury’s orderly evaluation of the evidence and had a devastating impact on the jury’s rational disposition towards other evidence.  The natural inclination of the jury was to infer Russell’s guilt in the Fast Freddy’s offense because “that’s the kind of man he is,” that is, the type of person who would force two women at gunpoint to perform sexual acts on each other for his entertainment.  The error in admitting the detailed testimony and photographs concerning the Vogt Street offense in the record before us appears to be of a greater magnitude and more likely to provoke a decision on an emotional basis than the error in the admission of extraneous offenses or bad acts in several other cases requiring reversal.  
See, e.g., Booker
, 103 S.W.3d at 533-38; 
Curtis
, 89 S.W.3d at 176-77;
 Page v. State, 
88 S.W.3d 755, 767-68 (Tex. App.—Corpus Christi 2002, pet. granted); 
DeLeon, 
77 S.W.3d at 312-16; 
Reyes
, 69 S.W.3d at 736-43; 
Webb,
 36 S.W.3d at 182-84; 
Avila,
 18 S.W.3d at 741-42.

After reviewing the entire record, including all of the exhibits, we cannot say with fair assurance that the admission of the Vogt Street offense evidence did not have a substantial and injurious effect or influence on the jury’s verdict. In fact, considering the large volume of detailed, emotionally-presented, inherently inflammatory evidence presented to the jury about the Vogt Street offense and considering the State’s discussion of this offense during opening statements and closing arguments, and the fact that twelve witnesses testified during trial concerning this offense, the record reflects a likelihood that the Vogt Street offense did have a substantial influence on the jury’s verdict.  We cannot say, with fair assurance, after considering the entire record without stripping it of the erroneous admission of the Vogt Street offense, that the judgment was not substantially swayed by the error.  Accordingly, we hold that the trial court’s erroneous admission of the Vogt Street extraneous offense evidence was harmful under Rule 44.2(b).  We sustain Russell’s fifth point.

IV.  Conclusion

Having sustained Russell’s fifth point, we need not consider Russell’s remaining points.  
See
 
Tex. R. App. P.
 47.1.  We reverse the trial court’s judgment and remand the case for a new trial.

SUE WALKER

JUSTICE

PANEL B: DAUPHINOT, GARDNER, and WALKER, JJ.

PUBLISH

DELIVERED: July 17, 2003

FOOTNOTES
1:
Unless otherwise indicated, all references to rules are to the Texas Rules of Evidence.

2:
The State also cites 
Ford v. State
, 484 S.W.2d 727 (Tex. Crim. App. 1972),
 but we do not discuss it because it is not a doctrine of chances case and because 
Ford
 held a subsequent alleged extraneous offense inadmissible.

3:
Specifically, in opening statement, the State argued:

That this Defendant, Kevin Barnes, [and others,] all participated in this third capital murder.

And you’re going to hear evidence about how after they raped these two women, forced these two women to perform oral sex on each other, held these two women at gunpoint, fired five shots into Shameka Rice - - She lives.  She survives somehow - - but how this Defendant shoots Cheron Hill in the head, executing her again, which clearly shows his intent to commit capital murder.

. . . . 

Once we’re done presenting to you all the evidence of these three capital murders that this Defendant committed, that he participated in, we will ask you to return a verdict of guilty in this case.

4:
One of the State’s references to the Vogt Street offense was:

One of the statements that Andre told you about that this Defendant made to him is that “after you’ve killed so many people, it doesn’t matter anymore.”  This statement tells you exactly everything you need to know about Carlis Russell and what he did at Fast Freddy’s that night, the killing of David Chapa, the S&A Food Store and the Vogt Street.