ACCEPTED
03-14-00617-CR
8024723
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/1/2015 9:12:51 AM
JEFFREY D. KYLE
CLERK

## No. 03-14-00617-CR

_____

# IN THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/2/2015 2:08:51 PM
JEFFREY D. KYLE
Clerk

_____

## NATHANIEL PAUL FOX, Appellant

v.

## THE STATE OF TEXAS, Appellee

_____

On Appeal from the 207th Judicial District Court of Comal County, Texas
Cause No. CR2013-091
Honorable Bruce Boyer, District Judge Presiding

_____

## AMENDED BRIEF FOR THE STATE

_____

**Jennifer Tharp**
**Criminal District Attorney**

**By**
**Joshua D. Presley**
**SBN: 24088254**
**Assistant District Attorney**
**150 N. Seguin Avenue, Suite #307**
**(830) 221-1300**
**Fax (830) 608-2008**
**New Braunfels, Texas 78130**
**E-mail: preslj@co.comal.tx.us**
**Attorney for the State**

## Oral Argument Is Requested

## Identity of Parties and Counsel

### Attorneys for the Appellant Nathaniel Paul Fox

**AT TRIAL**
Roy L. Warren
SBN: 20888685
1775 Oakwood Loop
San Marcos, TX  78666
Telephone: (512) 392-5188
Facsimile: (512) 847-6901

**ON APPEAL**
Paul A. Finley
401 Main Plaza, Suite 200
New Braunfels, Texas 78130
Telephone: (830) 625-8026
Facsimile: (830) 625-4433
Email: pfinley@reaganburrus.com

### Attorneys for the Appellee, The State of Texas

**AT TRIAL**
Sammy McCrary
Chief Felony Prosecutor
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas  78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: mccras@co.comal.tx.us

Jennifer Tharp
Comal County Criminal District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas  78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: tharpj@co.comal.tx.us

**ON APPEAL**
Joshua D. Presley
Assistant District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email: preslj@co.comal.tx.us

# Table of Contents

Index of Authorities ...................................................................................................v

Statement of the Case.................................................................................................1

Issues Presented ........................................................................................................1

Statement of Facts ....................................................................................................2

**Appellant's Convictions Did Not Violate Double Jeopardy** ......................9

    Summary of the Argument...................................................................9

    Argument.............................................................................................9

**Appellant Cannot Show Ineffective Assistance of Counsel** ......................16

    Summary of the Argument.................................................................16

    *Ineffective Assistance of Counsel Standard of Review on Appeal* ......17

    Argument...........................................................................................20

    *Counsel Was Not Ineffective for Failing to Object to*
    *Admissible Evidence*........................................................................20

    *A More Specific Limiting Instruction Might Have Harmed*
    *Appellant in the Circumstances of His Case*......................................31

Prayer .....................................................................................................................36

Certificate of Service ..............................................................................................37

Certificate of Compliance .......................................................................................38

# Index of Authorities

## Statutes & Rules

Tex. Crim. Proc. Code Ann. § art. 37.09 ...............................................................11

Tex. Pen. Code Ann. § 19.02 ...............................................................................12

Tex. Pen. Code Ann. § 22.02 ...............................................................................10

## Cases

*Agbogwe v. State*, 414 S.W.3d 820 (Tex. App.—
Houston [1st Dist.] 2013, no pet.).....................................................................31

*Alvarez v. State*, 511 S.W.2d 493 (Tex. Crim. App. 1973) .....................................29

*Bigon v. State*, 252 S.W.3d 360 (Tex. Crim. App. 2008).................................13, 14

*Blockburger v. United States*, 284 U.S. 299 (1932) ..............................................12

*Childress v. State*, 285 S.W.3d 544 (Tex. App.—Waco
2009, pet. ref'd)..............................................................................................14

*Colburn v. State*, 966 S.W.2d 511 (Tex. Crim. App.
1998) ..............................................................................................................14

*Delrio v. State*, 840 S.W.2d 443 (Tex. Crim. App. 1992) ................................18, 34

*Duvall v. State*, 59 S.W.3d 773 (Tex. App.—Austin 2001,
pet. ref'd)........................................................................................................12

*Ervin v. State*, 991 S.W.2d 804 (Tex. Crim. App. 1999)........................................15

*Ex parte Torres*, 991 943 S.W.2d 469 (Tex. Crim. App.
1997) ..............................................................................................................19

*Garcia v. State*, 57 S.W.3d 436 (Tex. Crim. App. 2001) .......................................18

*Gilbert v. State*, 808 S.W.2d 467 (Tex. Crim. App. 1991) .....................................30

*Girdy v. State*, 213 S.W.3d 315 (Tex. Crim. App. 2006) ........................................11

*Gonzales v. State*, 304 S.W.3d 838 (Tex. Crim. App. 2010) ...............................................................................13, 14, 15

*Goodspeed v. State*, 187 S.W.3d 390 (Tex. Crim. App. 2005) ..........................................................................................20

*Hall v. State*, 225 S.W.3d 524 (Tex. Crim. App. 2007) ..................................10, 14

*Halliburton v. State*, 528 S.W.2d 216 (Tex. Crim. App. 1975) ......................................................................22, 23, 29, 30

*Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986) ..........................................................................................35

*Jacob v. State*, 892 S.W.2d 905 (Tex. Crim. App. 1995) .......................................11

*Lemmons v. State*, 75 S.W.3d 513 (Tex. App.—San Antonio 2002, pet. ref'd). ..................................... 21, 22, 27, 29, 31, 34

*Littrell v. State*, 271 S.W.3d 273 (Tex. Crim. App. 2008) ....................................10

*Lopez v. State*, 343 S.W.3d 137 (Tex. Crim. App. 2011) ..................................17, 18

*Mallett v. State,* 65 S.W.3d 59 (Tex. Crim. App. 2001) ........................................19

*Mata v. State*, 226 S.W.3d 425 (Tex. Crim. App. 2007) .......................18, 19, 20, 31

*McCrary v. State*, 327 S.W.3d 165 (Tex. App.—Texarkana 2010, no pet.)................................................................10, 12

*Missouri v. Hunter*, 459 U.S. 359 (1983) .............................................................. 10

*Oakes v. State*, 07-07-0128-CR, 2010 WL 668541, at *1 (Tex. App.—Amarillo Feb. 25, 2010, no pet.) (mem. op., not designated for publication) .......................................................................... 21

*Ortiz v. State*, 93 S.W.3d 79 (Tex. Crim. App. 2002) ....................................... 20, 31

vi

*Patrick v. State*, 906 S.W.2d 481 (Tex. Crim. App. 1995)..................................... 18

*Perez v. State,* 310 S.W.3d 890 (Tex. Crim. App. 2010) ..........................................18

*Perry v. State*, 06-13-00051-CR, 2014 WL 3973929 (Tex. App.—Texarkana Aug. 15, 2014), *reh'g overruled* (Sept. 15, 2014), *petition for discretionary review refused* (Jan. 14, 2015) (mem. op., not designated for publication) .............................9, 12, 13, 31

*Ruiz v. State*, 579 S.W.2d 206 (Tex. Crim. App. 1979) ..........................................29

*Russell v. State*, 113 S.W.3d 530 (Tex. App.—Fort Worth 2003, pet. ref'd)........................................................................................21, 30

*Rylander v. State*, 101 S.W.3d 107 (Tex. Crim. App. 2007)............................20, 31

*Skillern v. State*, 890 S.W.2d 849 (Tex. App.—Austin 1994, pet. ref'd) .......................................................................................27

*Smith v. State*, 286 S.W.3d 333 (Tex. Crim. App. 2009) .........................................34

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................................17

*Thompson v. State,* 9 S.W.3d 808 (Tex. Crim. App. 1999)....................................18

*Tong v. State,* 25 S.W.3d 707 (Tex. Crim. App. 2000) ...........................................19

*Turner v. State*, 4 S.W.3d 74 (Tex. App.—Waco 1999, no pet.)..................................................................................................27

*Zuliani v. State*, 383 S.W.3d 289 (Ct. App.—Austin 2012, pet. ref'd)...................................................................................14, 15

## Statement of the Case

Appellant was indicted by a grand jury on March 13, 2013, for Murder and Aggravated Assault of a Family or Household Member with a Deadly Weapon, both first-degree felonies (I C.R. at 6). After pleading "not guilty" to each count, a jury returned judgments of conviction against Appellant for both offenses on August 22, 2014 (*id*. at 34-36). On August 29, 2014, the trial court sentenced Appellant to 60 years in the Texas Department of Criminal Justice – Institutional Division on each count, to be served concurrently (*id*. at 37, 41). Appellant timely filed his notice of appeal on September 14, 2014 (*id*. at 160).

## Issues Presented

1. Is Appellant subjected to Double Jeopardy for multiple punishments when his offenses each require proof of an element which the other does not, and the Ervin factors seem to indicate a legislative intent to impose multiple punishments?

2. Is counsel ineffective for failing to object to evidence which Texas case law holds is admissible to rebut Appellant's claim of self-defense?

3. Is counsel's performance deficient for failing to request a limiting instruction when the instruction itself might be harmful to the Appellant? Further, assuming arguendo that counsel's performance was deficient, can Appellant obtain reversal where he cannot demonstrate a reasonable probability that the result would have been different even with such an instruction?

## Statement of Facts

The Appellant, Nathaniel Paul Fox, had an "[u]p and down" relationship with his live-in girlfriend Melissa Eason, the victim in the instant case (V R.R. at 172). In the early part of 2011, Appellant and Melissa were living with her sister Alicia (*id*. at 34). Alicia said that Appellant and Melissa had a bad relationship (*id*. at 35). Alicia had observed bruises on her sister's arm on multiple occasions (*id*. at 36-37). Late one night – on April 2, 2011 – Melissa ran into Alicia's room; Melissa was screaming that Appellant "was trying to kill her, he tried to strangle her" (*id*. at 35). Alicia saw rug burns on Melissa's face, blood from her ear, and marks around her sister's neck (*id*. at 36).

Responding officers found Melissa shaken and crying (III R.R. at 25). Melissa told Sergeant Nelms that Appellant – an aspiring mixed martial arts fighter – had assaulted her after she returned home from hanging out with her friends (*id*.; *id*. at 121; V R.R. at 182-83). Melissa said Appellant held her down with her arms behind her back, lifting her arms and forcing her head into the ground for around 30 minutes (III R.R. at 26). She complained of pain in her shoulder, left ear and neck; Nelms observed that her left ear was bleeding "from where it was tearing from… her head" (*id*. at 26).[1] Officers arrested Appellant after learning he had

---

[1] Photos of Melissa's injuries were later shown to the jury (*id*. at 27-28; *see also* VIII R.R. at 10-17).

violated a New York protective order which prohibited him from being in contact with Melissa (*id.* at 28). Alicia thereafter refused to allow Appellant to live in her home with Melissa (*id.* at 36). Alicia was "worried about the safety of my own family with my young daughter" as well as Melissa (*id.*).

Subsequently, Appellant resided with Melissa at 211 East Merriweather (*id.* at 39). On November 1, 2012, New Braunfels Police Officer Derrick Bobo responded to a call at 211 East Merriweather (*id.*). Melissa reported Appellant had pushed her down on October 30th, bruising her in the process (*id.* at 39-40). The officer observed and photographed one of Melissa's injuries (*id.* at 40). Appellant had told Melissa that if she ever left him he would kill her (*id.* at 41). Melissa appeared to be afraid of Appellant (*id.*). Melissa told the officer that "she didn't feel like she'd be alive past February and that [Appellant] had a shotgun on lay-away" (*id.*).

Mallory Eason likewise testified that her sister Melissa and Appellant had a bad relationship (*id.* at 48). Mallory had seen Appellant physically abuse Melissa (*id.*). In a conversation with Mallory on New Year's Eve – December 31, 2012 – Melissa said she was planning to leave Appellant (*id.* at 48). Melissa said that "she needed to leave and get away because she feared that she was going to wake up dead one day" (*id.* at 49). Although at the time Mallory joked that Melissa could not "wake up dead," she asked her sister not to go back to Appellant's residence

3

without a police escort (*id*.). Melissa assured Mallory that she would spend the night at her friend Jessica's house, and that she would see Mallory again the next day (*id*.).

Appellant planned to spend New Year's Eve with another girl (V R.R. at 188). Melissa found out about the date; she knew the girl, and went to talk to her about Appellant (*id*. at 189). As a result, Appellant spent New Year's Eve alone (*id*. at 188). In a later conversation with an ex-girlfriend, Appellant would say that he was "looking forward to the date and then Melissa went and found her and had a fucking chat with her" (*id*. at 190). During cross-examination, when asked if during this same conversation he had said "[f]uck you, Bitch. You don't get to decide who I fucking talk to," Appellant claimed he could not recall (*id*. at 190-91).

Melissa stayed at Jessica Villareal's house on the night of December 31, 2012 (III R.R. at 52-53). Jessica said that Melissa was planning on leaving Appellant, and that she spent the night at Jessica's house because Melissa "didn't know what [Appellant] would do if he got drunk" (*id*. at 53). Melissa had a new residence she planned to move into about two weeks after New Year's Eve (*id*. at 53). The next morning on New Year's Day, Melissa told Jessica good-bye and left her house around 6:30 a.m. (*id*. at 54).

4

Appellant's neighbor heard Appellant's distinctive car door slam around 11:00 a.m. on New Year's Day (*id*. at 67). Appellant drove to and from his New Braunfels apartment two to three times that morning (*id*. at 68). Though the neighbor asked Appellant what he was doing during Appellant's final stop at his apartment, Appellant drove off without answering (*id*. at 67-68). Appellant's mother called police after Appellant told her over the phone that he had been in a disturbance with his girlfriend, and that his girlfriend was dead (VIII R.R. State's Ex. 12 at 00:25; III R.R. 177). Police arrived at Melissa and Appellant's apartment around 20 to 30 minutes after Appellant left, at about 2 p.m. (III R.R. at 68, 77). After gaining entry to the apartment, officers found Melissa dead, her body lying face down (III R.R. at 86). Corporal Fuller observed that Melissa's body was strangely positioned on a neatly laid-out jacket (*id*. at 88-89).

Meanwhile, Appellant drove to a co-worker's girlfriend's house (V R.R. at 16). Once he reached the house, Appellant did not immediately get out of his truck – he sat in his vehicle until his co-worker, Leslie Schmidt, approached him (*id*. at 29). Appellant looked visibly upset (*id*. at 17). Appellant said that Melissa had shown up at their apartment, and that during a fight he had "choked her out" (*id*. at 18, 30). Schmidt's girlfriend Raulings was standing outside the house, away from the initial conversation (*id*. at 29). Schmidt approached her and told her that "[Appellant] might really have messed up this time" (*id*. at 30). Raulings said

5

"[Appellant] was worried that he'd hurt his girlfriend in a… bad way. He basically said that he thought maybe she was dead" (*id*. at 30). Raulings also heard Appellant say "maybe he should run, [to] Mexico, maybe he should take his own life" (*id*. at 31).

Around 2:26 p.m., Officer Sabedra tried calling Appellant's phone (III R.R. at 101; V R.R. at 72-73). Appellant apparently answered the phone (*see* III R.R. at 102). When the officer identified himself and asked if the Appellant would mind talking with him, Appellant responded "Yeah, I do," and hung up (*id*.). When Sabedra redialed the number, no one answered the phone (*id*.). Appellant then drove his truck to Landa Park and "ripped the battery out of his cell phone" so the police could not track it (*id*. at 157). After abandoning his truck, Appellant either walked or rode back to Rauling's house with Schmidt (V R.R. at 35). Officers later received a report that Appellant's unoccupied truck had been left in Landa Park (III R.R. at 103). Officers found Appellant's cell phone with the battery disconnected inside the truck (*id*. at 145). Detective Hobbs knew that people would sometimes remove batteries from their cell phones to try to avoid being tracked by the police (*id*. at 146).

Appellant stayed with Raulings over the next few days (V R.R. at 33). From time to time, he would "hang his head and say that he didn't mean to do it" (*id*.). After a warrant was issued for Appellant's arrest, Raulings insisted on going to the

6

police station (*id*. at 37). Appellant said "It's time to pay the piper," and Raulings dropped him off in front of the station (*id*. at 37, 36). Appellant did not enter the police station, however, and he was eventually taken into custody at Bob's Billiards (*id*. at 36).

At trial, a forensic scientist testified that DNA under Melissa's fingernails was consistent with Appellant's DNA (*id*. at 143, 144, 146). Photos of Appellant – taken four days after Melissa's death – showed scratch marks on his right arm and shoulder (III R.R. at 92-93; VIII R.R. at 39-55). There was also testimony that Melissa had been struck on the head (V R.R. at 92). A forensic pathologist testified that the hyoid bone in Melissa's neck had been broken, and the cause of Melissa's death was asphyxia by strangulation (*id*. at 101; 90). The manner of death was homicide (*id*. at 102).

Appellant tried to elicit from witnesses that Melissa had been the aggressor in previous incidents (*see* III R.R. at 30, 70). He elicited from Schmidt that Appellant was "mellow" and did not lose his temper (V R.R. at 23). During Appellant's cross-examination of Schmidt, he introduced testimony that Melissa was "vicious," and that Appellant may have lacked the intent to kill her (*id*. at 24-25). Appellant further elicited that a neighbor had never seen him "lose his cool" with Melissa, even after she slapped him (*id*. at 156). Appellant emphasized that "she was the fighter" (*id*.). When Appellant took the stand, he testified about a

7

"blood choke" move he had learned in the Marines (*id*. at 179). He said he used the move against Melissa in self-defense, to give himself time to escape her assault (*id*. at 184-85, 192-93). He testified that he was worried Melissa was going to beat him to death (*id*. at 194). The State then cross-examined Appellant with aggressive statements he made about other inmates (*id*. at 197-98, 200-02, 206).

Appellant asked for and received a jury charge instruction on self-defense (*id*. at 28). He argued self-defense to the jury in closing (VI R.R. at 39-40, 46). The jury returned guilty verdicts on Count I, Murder, and Count II, Aggravated Assault of a Family or Household Member with a Deadly Weapon (*id*. at 68-69). The Court sentenced Appellant to concurrent sentences of 60 years for each count (VII R.R. at 39).

## Appellant's Convictions Did Not Violate Double Jeopardy

### Summary of the Argument

Appellant contends that his convictions for Murder and Aggravated Assault violated his right against Double Jeopardy under the Fifth Amendment of the United States Constitution. *See* Brief for Appellant at 7. However, the Legislature may impose multiple punishments for the same conduct consistent with the Constitution. Because Appellant's aggravated assault as charged is not a lesser-included offense of the charged murder, and because the *Blockburger* analysis and *Ervin* factors indicate the Legislature intended to impose multiple punishments for his conduct, the Court should overrule Appellant's first point of error.

### Argument

The Double Jeopardy guarantee against multiple punishments for the same offense is not absolute; it is designed to prevent courts from prescribing greater punishment than the Legislature has intended. *Perry v. State*, 06-13-00051-CR, 2014 WL 3973929, at *5 (Tex. App.—Texarkana Aug. 15, 2014), *reh'g overruled* (Sept. 15, 2014), *petition for discretionary review refused* (Jan. 14, 2015) (mem. op., not designated for publication) (citing *McCrary v. State*, 327 S.W.3d 165, 171-72 (Tex. App.—Texarkana 2010, no pet.). "When the Legislature specifically authorizes multiple punishments under two statutes, even if those two statutes proscribe the same conduct, 'a court's task of statutory construction is at an end

and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.'" *McCrary v. State*, 327 S.W.3d 165, 172 (Tex. App.—Texarkana 2010, no pet.) (citing *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983)). However, when one charged act is a lesser-included offense of another, absent a clear expression of legislative intent to the contrary, they are considered the same for Double Jeopardy purposes. *Littrell v. State*, 271 S.W.3d 273, 279 (Tex. Crim. App. 2008).

To determine whether an offense is a "lesser-included offense" of murder, courts now examine the required elements of the offenses charged, and not the evidence proved at trial. *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007).[2] Appellant was charged with Murder and Aggravated Assault of a Family or Household Member with a Deadly Weapon (hereinafter "aggravated assault"). Appellant's aggravated assault as charged required the State to prove that Appellant used a deadly weapon during the commission of the offense, and that Appellant caused serious bodily injury to Melissa Eason, whose relationship to the defendant was described by 71.0021(b) or 71.005 of the Family Code. *See* Tex. Pen. Code Ann. § 22.02(a), (b); VI R.R. at 21-22. The relationship element was not a required element of Appellant's murder charge. Because proof of such a

---

[2] *Hall* noted that although the evidence in that murder trial may have shown "threatening and display," these were not *required* elements of the murder, and aggravated assault by threat was therefore not a lesser-included offense. *Id*. at 537.

10

relationship is not *required* to be proved for the offense of murder, it cannot be said that the aggravated assault as alleged "is established by proof of the same or less than all the facts required to establish the commission of the offense charged."[3]*See* Tex. Crim. Proc. Code Ann. § art. 37.09 (West, Westlaw through 2013 Sess); *see also Jacob v. State*, 892 S.W.2d 905, 908 (Tex. Crim. App. 1995) ("The State argues this focuses on the evidence the State presented to prove the charged offense. But such interpretation negates the language of Article 37.09(1) by changing 'facts required' into 'facts presented.' 'Facts required' means the evidence legally required to prove the elements."). Accordingly, as charged in this particular case, aggravated assault is not a lesser-included offense of murder.[4] *See id*; *see also* VI R.R. at 15-17, 21-22.

The *Blockburger* test is one tool used to determine if the Legislature intended multiple punishments. "When the same act or transaction violates two

---

[3] In citing *Girdy v. State*, Appellant overlooks that case's language which held that if the State "in proving the elements of one charged offense, also *necessarily* proves another charged offense, then that other offense is a lesser-included offense." 213 S.W.3d 315, 319 (Tex. Crim. App. 2006) (emphasis in original). *Girdy* found the particular offense at issue in that case to be a lesser included offense because it was "established by proof of the same or less than all the facts required to establish the commission" of the greater offense. *Id*. Even if *Girdy* stood for the proposition that "in proving the elements of one charged offense [the State] also proves another charged offense the other offense is a lesser included" (Brief for Appellant at 8), the later *Hall* case would have overruled it. *See* 225 S.W.3d at 535, *supra* (at 10).

[4] Appellant's citation of *Langs v. State* for the proposition that multiple punishments for both a greater offense and a lesser included offense violate Double Jeopardy is therefore inapposite; as in *Hall*, the particular aggravated assault in Appellant's case is not a lesser included offense of the murder. Brief for Appellant at 7; *see also* 225 S.W.3d at 537.

11

different penal statutes, the two offenses are the same for double jeopardy purposes if one of the offenses contains all the elements of the other; they are not the same if each offense has a unique element." *Duvall v. State*, 59 S.W.3d 773, 777 (Tex. App.—Austin 2001, pet. ref'd) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). As noted *supra*, the State was not required to prove the relationship element for the murder offense. Conversely, to prove the murder in Appellant's case, the State was required to prove that Appellant caused the victim's death (I C.R. at 29-30); Tex. Pen. Code Ann. § 19.02 (West, Westlaw through 2013 Sess.). This was not a required element to prove Appellant's aggravated assault (I C.R. at 33-34). Because each offense requires proof of an element the other does not, applying the *Blockburger* test to Appellant's case establishes a presumption that "the Legislature intended to authorize punishments under both." *See Perry*, 2014 WL 3973929, at *6 (citing *McCrary*, 327 S.W.3d at 172). That is not the end of the analysis, however. Courts must next consider:

> [1] whether [the] offenses are in the same statutory section; [2] whether the offenses are phrased in the alternative; [3] whether the offenses are named similarly; [4] whether the offenses have common punishment ranges; [5] whether the offenses have a common focus; [6] whether the common focus tends to indicate a single instance of conduct; [7] whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would result in the offenses being considered the same under *Blockburger*; and [8] whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double-jeopardy purposes.

12

*Id.* (citing *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008)).

Murder and Aggravated Assault are located in different chapters of the Penal Code. Accordingly, they cannot be phrased in the alternative, and this factor is inapplicable. The two offenses are not named similarly. Murder is a first-degree felony, as is the particular aggravated assault charged. The "imputed theory" factor is inapplicable to Appellant's case.

Although both offenses are result-oriented crimes, *Gonzales v. State* noted that "[i]f the focus of the offense is the result—that is, the offense is a 'result of conduct' crime—then *different types of results are considered to be separate offenses*, but different types of conduct are not." 304 S.W.3d 838, 848 (Tex. Crim. App. 2010) (emphasis added). Appellant cites *Bigon v. State*. Brief for Appellant at 8. In that particular case, the Court observed "[t]he focus of [murder and intoxication manslaughter] is the same: *the death of an individual*. Both offenses are result oriented and punish one for *causing the death of another….the sameness of the result* is an indication that the Legislature did not intend to impose multiple punishments." 252 S.W.3d at 371 (emphasis added).

By contrast, in Appellant's case, the focus and ultimate results of his offenses are different. The result contemplated and proscribed by the aggravated assault of a family or household member statute is the "harm inflicted to a victim in the same household." *See Perry*, 2014 WL 3973929, at *7. The result

13

contemplated and proscribed by the murder statute is causing the death of an individual. That there was overlap in the *evidence* used to establish Appellant caused the death of an individual and inflicted harm to a victim in the same household is not determinative; as Appellant correctly states, "[t]he focus is on the elements in the charging instrument." Brief for Appellant at 7 (citing *Bigon*, 252 S.W.3d at 370); s*ee also Hall*, 225 S.W.3d at 535; *Cf. Childress v. State*, 285 S.W.3d 544, 549 (Tex. App.—Waco 2009, pet. ref'd) (focus is on element, not proof of the offense; "the Supreme Court eliminated the 'same conduct' rule—the idea that just because [appellant] engaged in one 'culpable act,' he cannot be convicted of more than one offense) (citing *United States v. Dixon*, 509 U.S. 688 (1993)). Because the Legislature was concerned with different types of results, factor five also supports the determination that Appellant's offenses are different. Because the focus is different, factor six does not indicate the Legislature viewed the offenses as the same for Double Jeopardy purposes.

Finally, there does not appear to be any legislative history containing an articulation of an intent to treat the offenses as the same or different. The Court in *Zuliani v. State* found the lack of any clear legislative history was a factor which did not favor multiple punishments. 383 S.W.3d 289, 294 (Ct. App.—Austin 2012, pet. ref'd) ("[the] legislature must 'make manifest its intention' to punish single act twice") (citing *Gonzales*, 304 S.W.3d at 846). *Gonzales* does not broadly hold that

the "legislature must 'make manifest its intention' to punish a single act twice"; rather, the Court in the particular context of that case observed that "[a]n accused may be punished for two offenses *even though they would be regarded as the same under a Blockburger analysis* if the Legislature has otherwise made manifest its intention that he should be." *Id*. at 845 (emphasis added). Notably, both *Zuliani* and *Gonzales* followed offenses which the *Blockburger* analysis indicated were the *same*. 383 S.W.3d at 294; 304 S.W.3d at 845. When comparing *Zuliani* and *Gonzalez* to Appellant's case, *Blockburger* indicates Appellant's offenses are *not* the same. Because the presumption is reversed in Appellant's case, the lack of legislative history should favor treating the offenses as *different*. *Cf. Zuliani*, 383 S.W.3d at 294; *Gonzales*, 304 S.W.3d at 845; *see also Ervin v. State*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999) ("whether there is legislative history containing an articulation of an intent to treat the offenses as *the same or different* for double jeopardy purposes") (emphasis added).

Factors one, three, five and eight indicate the Legislature intended to treat the offenses as different for purposes of Double Jeopardy; only factor four (common punishment ranges) supports treating the offenses as the same. If anything, the presumption established by the *Blockburger* analysis in Appellant's case – that the Legislature intended multiple punishments – is only strengthened by the *Ervin* factor analysis. *See Gonzales*, 304 S.W.3d at 848 ("we have signaled that

15

the 'focus' or 'gravamen' of a penal provision [factor five] should be regarded as the 'best' indicator when it comes to determining whether the Legislature intended to define more than one offense.").

## Appellant Cannot Show Ineffective Assistance of Counsel

### Summary of the Argument

Appellant claims his counsel was ineffective for failing to object to the State's cross-examination using Appellant's statements to others in recorded jail phone calls. Because the record on appeal generally lacks counsel's motivations and reasoning, claims of ineffective assistance are not usually appropriate matters for appeal. In any event, defense counsel was not ineffective for failing to object to evidence which became admissible once Appellant raised issues related to his intent and self-defense. Furthermore, counsel may have had strategic reasons for failing to request a limiting instruction: in the particular circumstances of Appellant's case, it may have been preferable to convince the jury to disregard the complained-of evidence entirely, rather than direct its application in a manner which would be most damaging to Appellant. Alternatively, even if a limiting instruction should have been requested, in light of the other evidence introduced – and the relatively innocuous nature of the complained-of evidence compared to the

16

actual charged conduct – Appellant cannot show a reasonable probability that a limiting instruction would have changed the outcome of the trial.

### *Ineffective Assistance of Counsel Standard of Review on Appeal*

The Sixth Amendment right to effective assistance of counsel does not provide a right to errorless counsel; it is a right to objectively reasonable representation. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy both prongs of *Strickland*, demonstrating both deficient performance by counsel as well as prejudice suffered by the defendant because of counsel's alleged deficient performance. 466 U.S. at 687; *Menefield v. State,* 363 S.W.3d 591, 592 (Tex. Crim. App. 2012).

Under the first prong, the Applicant must demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88. To satisfy the second prong of *Strickland*, the Applicant has to show the existence of a reasonable probability – one sufficient to undermine confidence in the outcome – that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. Failure to make the required showing of either deficient performance *or* sufficient prejudice defeats the ineffectiveness claim.

*Strickland,* 466 U.S. at 700; *see Perez v. State,* 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

"It is not sufficient that the appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). In making its assessment of counsel's assistance, the reviewing court examines the totality of the representation and the circumstances of each case without the benefit of hindsight. *Lopez,* 343 S.W.3d at 142-43; *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Garcia v. State*, 57 S.W.3d 436, 430 (Tex. Crim. App. 2001). The reviewing court must presume that counsel is better positioned to judge the pragmatism of the particular case, and that he "made all significant decisions in the exercise of reasonable professional judgment." *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) (citing *Strickland v. Washington*, 466 U.S. at 690).

Reviewing courts will indulge in a strong presumption that trial counsel's performance was reasonable. *Patrick v. State*, 906 S.W.2d 481, 495 (Tex. Crim. App. 1995). The "[a]ppellant has the burden of proving ineffective assistance by a preponderance of the evidence." *Id*. (citing *Cannon v. State*, 668 S.W.2d 401 (Tex. Crim. App. 1984)). The Court has also noted that "the presumption that trial counsel's performance was reasonably based in sound trial strategy, coupled with

18

the absence of any supporting evidence in the record of unreasonableness, compels a reviewing court to consider ways in which trial counsel's actions were within the bounds of professional norms." *Mata*, 226 S.W.3d at 431.

To prevail on a claim of ineffective assistance of counsel, an appellant must provide a record that affirmatively demonstrates that defense counsel's performance was not based on sound strategy. *Mallett v. State,* 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). If the appellate record is silent regarding the reasons for defense counsel's conduct, then it is insufficient to overcome the presumption that counsel was following a legitimate strategy. *Tong v. State,* 25 S.W.3d 707, 714 (Tex. Crim. App. 2000); *Thompson,* 9 S.W.3d at 813–14; *Jackson v. State,* 877 S.W.2d at 771 (refusing to hold counsel's performance deficient given the absence of evidence concerning counsel's reasons for choosing the course he did).

As the Court stated in *Ex parte Torres,* "[i]n most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim." 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (internal citations omitted). The Court has noted that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective. Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'"

*Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting

*Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2007)).

Accordingly, the Court has repeatedly held that post-conviction writs of habeas corpus are the more appropriate or preferable means of raising a claim of ineffective assistance of counsel. *See, e.g., Rylander*, 101 S.W.3d at 110-11; *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); *Mata*, 226 S.W.3d at 430 ("[t]he lack of a clear record usually will prevent the appellant from meeting the first part of the *Strickland* test, as the reasonableness of counsel's choices and motivations during trial can be proven deficient only through facts that do not normally appear in the appellate record").

#### Argument

*Counsel Was Not Ineffective for Failing to Object to Admissible Evidence*

Even if the Court determines the record is sufficient to fairly evaluate counsel's choices as they relate to his failure to object to the evidence, case law demonstrates that such evidence was admissible in the circumstances of Appellant's case. To show deficient performance of counsel for a failure to object, an appellant must show that the unobjected-to evidence was inadmissible. *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002). It is the trial court's responsibility to determine whether extraneous offense evidence is relevant for a purpose other

20

than the propensity of an appellant to commit bad acts. *Russell v. State*, 113 S.W.3d 530, 535 (Tex. App.—Fort Worth 2003, pet. ref'd). "So long as the trial court's decision to admit or exclude evidence falls in the zone within which reasonable minds may differ, appellate courts should refrain from disturbing the trial court's decision on appeal." *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990), *on reh'g* (June 19, 1991). Finally, "[a]n extraneous offense may be used to rebut a defensive theory, such as self-defense, even though this purpose is not mentioned in Rule 404(b)." *Oakes v. State*, 07-07-0128-CR, 2010 WL 668541, at *1 (Tex. App.—Amarillo Feb. 25, 2010, no pet.) (mem. op., not designated for publication) (citing *Crank v. State,* 761 S.W.2d 328, 341 (Tex. Crim. App. 1988).

The court in *Lemmons v. State* detailed a particularly pertinent use for extraneous conduct evidence: to rebut the appellant's theory of self-defense. 75 S.W.3d 513, 523 (Tex. App.—San Antonio 2002, pet. ref'd). In *Lemmons*, while the appellant did not take the stand himself during his capital murder trial, he introduced some evidence of self-defense through other witnesses. *Id*. The State then argued the appellant had opened the door on the issue of self-defense, and was allowed to call three witnesses to testify about an extraneous robbery at gunpoint. *Id*. at 522. On appeal, the *Lemmons* court observed that the appellant had introduced evidence of self-defense and had obtained an instruction on self-defense

21

in the charge. The court of appeals then held that "the extraneous robbery offense was relevant under rule 401 to rebut [the appellant's] self-defense theory." *Id.*[5] In Appellant's case, not only did he likewise attempt to elicit evidence of and obtain a jury charge instruction on self-defense, he *expressly* testified on cross-examination that he was acting in self-defense (V R.R. at 184-85, 218; VI R.R. at 13-14).

*Halliburton v. State* is even more on point with the facts of Appellant's case. In *Halliburton*, the appellant testified that she shot the deceased in self-defense after he threatened her with a gun. 528 S.W.2d 216, 217 (Tex. Crim. App. 1975). The State then called another man who testified that appellant had pulled up beside him while he was walking down the street and demanded money he owed her. *Id.* at 217. When he told her he did not have any money, the appellant got out of her car and shot him as he tried to run away. *Id.* Notably, this happened around five weeks after the shooting for which the appellant was on trial. *Id.* When the appellant complained about the admission of the extraneous shooting evidence, the Court of Criminal Appeal observed that the appellant had raised the issue of self-defense and no intent to kill. *Id.* The Court first noted its prior case law allowed for the introduction of an extraneous offense to refute a defensive theory. *Id.* at 218 (citing *Ratcliff v. State*, 504 S.W.2d 883 (Tex. Crim. App. 1974)). Applying that and other precedents, *Halliburton* stated that "[t]he appellant testified to self-

---

[5] *See also Santellan v. State,* 939 S.W.2d 155, 168 (Tex. Crim. App.1997) (holding extraneous conduct subsequent to the charged offense was admissible).

22

defense and that she had no intent to kill. She wanted the jury to believe her testimony. The State was authorized to show that she shot another man some time later to show her intent which tended to disprove her testimony." *Id.*

In the instant case, from the beginning of the State's case in chief, Appellant attempted to construct a narrative of cool, reactive self-defense in the face of the victim's dangerous aggression. On cross-examination of the State's first witness, Appellant elicited that he had been the one to call police during a prior domestic incident (III R.R. at 30), and tried to show that the victim, Melissa, had inflicted physical injuries on Appellant (*id.*). After stressing that one of Melissa's sisters had never seen a physical fight between Appellant and Melissa (*id.* at 55), Appellant elicited from his neighbor that the victim had once "slapped [Appellant] so hard his glasses flew off" (*id.* at 70). Appellant sought to present himself to the jury as a passive, collected individual who at worst had inadvertently killed Melissa:

| | |
|---|---|
| [Defense:] | You said you've known [Appellant] for about six months? |
| [Schmidt:] | Yes, I – guess so. |
| [Defense:] | Before this? |
| [Schmidt:] | I don't know. |
| [Defense:] | Did you *ever* see him lose his temper? |
| [Schmidt:] | No, very mellow. |

23

| [Defense:] | Okay. Did he *ever* lose his temper with you or threaten you? |
| --- | --- |
| [Schmidt:] | No. |

....

| [Defense:] | How did you feel about Melissa Eason? |
| --- | --- |
| [Schmidt:] | She was vicious. |

....

| [Defense:] | Do you think [Appellant] loved Melissa Eason? |
| --- | --- |
| [Schmidt:] | He did at one time. |
| [Defense:] | And do you think he intentionally tried to kill her? |
| [Schmidt:] | No. |

(V R.R. at 23-25) (emphasis added). At the beginning of Appellant's case in chief, he recalled his neighbor John Gomez to further emphasize that he had never seen Appellant be physically aggressive, even after Melissa had slapped him:

| [Gomez:] | ...she had already slapped him and his glasses were on the ground. |
| --- | --- |
| [Defense:] | And he didn't do anything back? |
| [Gomez:] | I just seen him grab her and I turned away and that's it.... |
| [Defense:] | Did you *ever* see [Appellant] lose his cool? |
| [Gomez:] | Not, no, not – no. |

24

> [Defense:]        And just to be clear… you said the only fights you saw were where *she was the fighter*.

(*id*. at 156) (emphasis added).

Once on the stand, Appellant again portrayed himself as cool and reactive, employing his military training to humanely incapacitate the enraged victim and escape her unending physical onslaught. Appellant first gave his account of the events leading up to the Melissa's death on cross-examination, in response to mostly non-leading questions (*see, e.g., id*. at 192-93). He claimed he was sleeping when Melissa came in "screaming, yelling, throwing stuff, [and] breaking stuff" (*id*. at 192). Appellant said that once he sat up on the bed, she punched him in the face – with a right, and a left, and another right (*id*. at 192-93). Appellant claimed he then tried to put his pants on, and while he was bent over she hit him with a "hammer fist in the back of the head" (*id*. at 193). Appellant then stated that "I know that there are knives all around the house and I know she's very dangerous, so I figured it [was] in my best interests to not be beaten to death. I needed to…. restrain her" (*id*.). When the State questioned whether a trained Marine could really be worried that "a girl" was going to beat him to death, Appellant again insisted that he was in fear for his life (*id*. at 194).[6] It was at this point in

---

[6] Appellant would later claim that the victim became violent when drinking, that she outweighed him by 30 pounds and was around three inches taller (*id*. at 210-11). He would claim that he was "afraid for [his] life" (*id*. at 210), that he left because he was afraid she was going to wake up and continue attacking him (*id*. at 215), and again that he was "terrified she was going to kill [him]" (*id*.). Appellant stressed self-defense in closing (VI R.R. at 38-40) ("[the witness] saw her slap

25

Appellant's constructed narrative that he claimed he calmly used his Marine training to defuse the situation (*see id.*).

Appellant had earlier testified about his prior military experience in choking a person into an unconscious state without harming him (*see id.* at 179). Appellant claimed that his "technique" was not dangerous (*id.* at 184). He asserted that he choked Melissa in measured and limited self-defense: "I choked her out for ten seconds till she was unconscious, long enough …. for me …. [to] get away" (*id.* at 184-85). Appellant claimed that his DNA ended up under Melissa's fingernails as she struggled against his restraint (*id.* at 195). Appellant continued to build on earlier-elicited testimony of his docile temperament, presenting himself to the jury as a controlled pacifist:

[State:]      You just kept choking her; didn't you?

[Appellant:]      I needed the violence to stop.

[State:]      Why didn't you just leave?

[Appellant:]      I was trying to.

(*id.*). When confronted with the Melissa's protective order against him in New York, Appellant insisted that the incident from which the order arose involved the *victim* attacking *him* (*id.* at 185-86). At one point, Appellant even claimed that –

---

him so hard, his glasses flew across. What did he do? He didn't respond. He didn't get mad. He didn't get upset. He just – you know, whenever he was trying to fight with her, he tried to subdue her.").

26

though he had choked the victim – he was not the person who strangled her to death (*id*. at 191-92). Appellant said he loved Melissa "[m]ore than life itself" (*id*. at 196).

Only after Appellant had presented such a narrative to the jury – of the physically violent and aggressive victim, his fear for his life, his calm self-defense response, and the theory that the death might have been an unfortunate accident – did the State introduce the complained-of evidence to rebut these false impressions. *See* Brief for Appellant at 10. Throughout the trial to that point, Appellant had incessantly emphasized his peaceful, non-violent demeanor and state of mind, even claiming he was only trying to put his pants on while the victim was beating him to death. As the court noted in *Lemmons*:

> [w]hen the accused claims self-defense or accident, the State, in order to show the accused's intent, may show other violent acts where the defendant was an aggressor. *Halliburton v. State*, 528 S.W.2d 216, 217-218 (Tex. Crim. App. 1975). This is the converse of the rule that allows a defendant to show extraneous acts of violence by the deceased in a murder case when the defendant claims self-defense and that the deceased was the first aggressor.

75 S.W.3d at 523 (some internal citations omitted) .[7]

---

[7] *See also Skillern v. State*, 890 S.W.2d 849, 864 (Tex. App.—Austin 1994, pet. ref'd) (declined to be followed on other grounds by *Ex part Jones*, 440 S.W.3d 628, 636 (Tex. Crim. App. 2014) ("When the defendant 'opens the door' on an issue by attempting to present an incomplete picture of an incident, the State is permitted to complete the picture by presenting evidence that would have otherwise been inadmissible.") (citing *Lucas v. State,* 791 S.W.2d 35, 53, 54 (Tex. Crim. App. 1989)); *Turner v. State*, 4 S.W.3d 74, 79 (Tex. App.—Waco 1999, no pet.) ("As with any other witness, when an accused testifies gratuitously as to some matter that is irrelevant or

Because Appellant presented evidence of both self-defense and accident, the State was entitled to establish several statements Appellant made in recorded jail phone calls during its cross-examination of Appellant (*see, e.g., id.* at 197-98). In the calls, Appellant stated that he was having issues with another inmate (*id.*). Appellant stated that he planned to let the other inmate take the first swing "and then I'll fuck him up if I don't break his neck" (*id.* at 197-98). Less than a month after his arrest for the victim's murder, Appellant said he would claim self-defense after his planned fight with the inmate (*see id.* at 197-98). In another conversation, Appellant told his ex-girlfriend that he was not simply going to fight another inmate – he was going to "fucking break him" and "leave him with physical injuries he'll never recover from," that "he will walk with a limp for the rest of his life," and that Appellant would "break his arm, leg, jaw and a couple of ribs" (*id.* at 200-01). Appellant added that he was "going to try to leave him conscious through the whole thing because I want him to feel every bit of pain" (*id.* at 201). Appellant stated he would "start smashing people" if his case's outcome looked bad, and that he would get violent if he was not moved (*id.*). He further said that he was "going to try to save somebody a trip to the hospital" and that he was going to "beat the shit" out of *two* other inmates (*id.* at 202; *see also id.* at 206).

---

collateral to the proceeding, he may be impeached by a showing that he has lied or is in error as to that matter.") (citing *Hammett v. State*, 713 S.W.2d 102 (Tex. Crim. App. 1986)).

"Given [Appellant's] introduction of self-defense as an issue, the State needed to rebut [Appellant's] claim that he was not the first aggressor." *See Lemmons*, 75 S.W.3d at 523-24. The foregoing was relevant and admissible to rebut the false impression Appellant gave to the jury – that he was a nonviolent recipient of the first-aggressor victim's attack, that he feared for his life, and that he intended no harm when he choked the victim unconscious. *See Halliburton*, 528 S.W.2d at 218 (State could use subsequent offense to show appellant's intent and disprove testimony).

Appellant points to the general rule against the introduction of extraneous offenses, and observes that such evidence "may be inadmissible when its only relevance is to show that a person is of a particular character." Brief for Appellant at 11. Appellant relies upon Texas Rule of Evidence 404(b) in arguing that an objection to the admission of the extraneous conduct would have been successful. *Id*. However, the case law cited in Appellant's brief is distinguishable from Appellant's case. *See id.*

In *Ruiz v. State*, the Court observed that there was "no disputed or contested factual issue to which the prior extraneous murder offense was relevant, material, and admissible." 579 S.W.2d 206, 210 (Tex. Crim. App. 1979). *Alvarez v. State* involved an extraneous offense "wholly disconnected" from the offense for which the appellant was on trial; intent was not even at issue in that case. 511 S.W.2d

493, 495 (Tex. Crim. App. 1973). In *Russell v. State*, the court of appeals actually deferred to the trial court's 404(b) determination, acknowledging that it could not "say that the trial court abused its discretion by concluding that the [extraneous] offense bore some relevance to the issue of [the appellant's] specific intent in the capital murder of [the victim]." 113 S.W.3d at 540.

Finally, although the Appellant's cited case *Gilbert v. State* found that the extraneous offense in that particular case was not relevant, it outlined situations where such offenses could be admissible:

> the State may introduce such evidence where it logically serves "to make ... more probable" an elemental fact; where it serves "to make ... more probable" an evidentiary fact that inferentially leads to an elemental fact; or *where it serves "to make ... less probable" defensive evidence that undermines an elemental fact*. Illustrative of the permissible "purposes" to which evidence of "crimes, wrongs, or acts" may be put are "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident [.]" Extraneous offense evidence that logically serves any of these purposes is "relevant" *beyond* its tendency "to prove the character of a person to show that he acted in conformity therewith."

808 S.W.2d 467, 472 (Tex. Crim. App. 1991) (first emphasis added) (internal citations omitted).

In Appellant's case, the extraneous remarks served to make less probable defensive evidence related to self-defense and accident. As the *Halliburton* Court remarked, "[i]f the extraneous offense is relevant in tending to disprove the defensive theory, it should be admissible." 528 S.W.2d at 219 (op. on reh'g); *see*

30

*also Lemmons*, 75 S.W.3d at 523-24. Because the evidence was relevant and admissible to rebut Appellant's self-defense claims and to show his intent, Appellant cannot cite to authority to show the evidence would have been *inadmissible* over his 404(b) objection, and his ineffective assistance claim based on his counsel's failure to object must fail. *See Ortiz*, 93 S.W.3d at 93; Brief for Appellant at 11.

## A More Specific Limiting Instruction Might Have Harmed Appellant in the Circumstances of His Case

Because the record does not clearly indicate counsel's reasons for not requesting a limiting instruction, Appellant cannot prove his counsel's strategy was not reasonable. *See, e.g., Rylander*, 101 S.W.3d at 110-11; *Jackson v. State*, 973 S.W.2d at 957; *Mata*, 226 S.W.3d at 430. "[T]he failure of defense counsel to request a limiting instruction is not, by itself, ineffective assistance." *Perry*, 2014 WL 3973929, at *17 (citing *Agbogwe v. State*, 414 S.W.3d 820, 832 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "Although 'hindsight speculation may suggest a limiting instruction of some nature' should have been given, a reasonable explanation for counsel's actions can be that, 'as a trial tactic, counsel did not wish to remind the jury of those matters.'" *Agbogwe*, 414 S.W.3d at 837 (citing *Webb v. State*, 995 S.W.2d 295, 300-01 (Tex. App.—Houston [14th Dist.] 1999, no pet.)).

Without the benefit of hindsight, a more particular limiting instruction might have worked against Appellant in the particular circumstances of his case.

After Appellant's remarks were introduced by the State, defense counsel immediately sought to explain the comments away as mere bravado (V R.R. at 209). Appellant testified that he had never actually hurt anyone in the way he threatened to hurt other inmates (*id*. at 210). He also testified that fellow inmates could overhear his phone conversations (*id*. at 211), and that it was important to act "tough" in front of them (*id*. at 209). Defense counsel spent a significant amount of time on the theme in closing:

> Men like to talk big. You guys know that…. You know, he had to talk that way. In prison, you don't talk like that, you're not going to get out alive…. he was doing what he thought he had to do. You know, look at the evidence. If he had been beating people up and shooting people, being a real problem, you would have heard about it. He didn't. *What, are you going to convict [him] of a crime he might commit in the future because they said he would? Because he's trying to keep people off his back? That's just ridiculous…. He was talking big.* He was a big fighter, or trying to make it seem that way anyway, so people wouldn't mess with him.

(VI R.R. at 41-42) (emphasis added). Counsel was plainly trying to convince the jury to dismiss the evidence altogether as entirely irrelevant.

Hostile prison conditions are well known, and the jury would have been generally familiar with them. In light of defense counsel's explanation of the threats as bluster, the threat of future harm against other inmates – perhaps justifiable in such conditions – was not overly inflammatory in and of itself.

32

Because there was no true risk the jury would convict Appellant for merely threatening future harm to fellow jail inmates instead of for his conduct of actually strangling the victim, the danger typically addressed by limiting instructions was not present. Indeed, the threats' most prejudicial aspect in regards to Appellant was their *proper application*. In light of the Appellant's claims of fear and self-defense, the threats helped demonstrate that he would not be afraid of the victim, contradicted the 'cool, collected, non-aggressive warrior monk' persona he tried to construct, and helped to rebut his claimed intent during the charged conduct. Defense counsel may well have preferred the general jury instruction[8] to the more particular instruction given in *Lemmons*:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose, unless you find and believe beyond a reasonable doubt that the defendant committed such other offense… and even then *you may only consider the same in determining whether the defendant acted in self-defense … regarding the charges set out in the indictment in this cause*.

75 S.W.3d at 525 (emphasis added). Given defense counsel's explanation of the prison threats as mere bluster and his attempt to convince the jury to disregard

---

[8] In its charge, the trial court generally instructed the jury that its "*sole duty is to determine the guilt or innocence of the defendant under the indictment in this case*, restrict your deliberations solely to the guilt or innocence of the defendant" (VI R.R. at 12). *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) ("We generally presume the jury follows the trial court's instructions in the manner presented.").

them *entirely*, such an instruction would only serve to focus the jury's attention on the threats' most damaging application.

Courts presume that counsel is in the best position to determine the appropriate strategy for trial. *Delrio*, 840 S.W.2d at 447 (citing *Strickland v. Washington*, 466 U.S. at 690). In the particular circumstances of Appellant's case, and without the benefit of hindsight, it cannot be said that no reasonable attorney would have failed to request a more specific limiting instruction. *See Smith v. State*, 286 S.W.3d 333, 342 (Tex. Crim. App. 2009).

Furthermore, it is notable that the complained-of evidence was elicited near the end of the guilt-innocence phase of Appellant's trial. The evidence took very little time to develop – the State elicited briefly elicited the evidence during its cross-examination of Appellant (*see* V R.R. at 197-207). The evidence closed on page 217 of that same volume. *See Lemmons*, 75 S.W.3d at 525 (observing the short lapse of time between the introduction of evidence and the limiting instruction). The jury was generally instructed to determine Appellant's guilt or innocence under the indictment, and there was no evidence to show that the jury formed an opinion prior to the time it began its deliberation. *See id.* (where the court noted factors which indicated any error did not affect a substantial right).

The same facts and issues detailed *supra* likewise demonstrate that there is not a reasonable probability that the result of the trial would have been different

34

with a more specific – perhaps detrimental – limiting instruction. *See Hernandez v. State*, 726 S.W.2d 53, 58 (Tex. Crim. App. 1986). Even with such an instruction, other evidence introduced at trial would have ensured the same result *See* Statement of Facts, *supra* (at 2-8). In light of all the other evidence, there is no danger the jury convicted Appellant for **threatening** unaccomplished future harm to hostile prison inmates instead of the charged conduct of actually **strangling** the young girl. Accordingly, because Appellant cannot show a reasonable probability that the result of the proceeding would have been different, his ineffective assistance claim related to the failure to request a limiting instruction must also fail.

## Prayer

Wherefore, premises considered, Appellee respectfully prays that this Honorable Court of Appeals affirm in all matters the judgment of the trial court in this case. In the alternative, Appellee respectfully prays that this Honorable Court reform the judgment to reflect Appellant's conviction and sentence for Murder and affirm as modified. The State further prays for all other relief to which it may be entitled.

JENNIFER THARP
Criminal District Attorney

By

/s/ Joshua D. Presley
**Joshua D. Presley**
SBN: 24088254
Assistant District Attorney
150 N. Seguin Avenue, Ste. #307
New Braunfels, Texas 78130
(830) 221-1300
Fax (830) 608-2008
E-mail: preslj@co.comal.tx.us
Attorney for the State

## <u>*Certificate of Service*</u>

I, Joshua D. Presley, Assistant District Attorney for the State of Texas, Appellee, hereby certify that a true and correct copy of this Amended Brief for the State has been delivered to Appellant NATHANIEL PAUL FOX's attorney of record in this matter:

Paul A. Finley
401 Main Plaza, Suite 200
New Braunfels, Texas 78130
Telephone: (830) 625-8026
Facsimile: (830) 625-4433
Email: pfinley@reaganburrus.com
*Attorney for Appellant on Appeal*

By electronically sending it through efile.txcourts.gov to the above-listed email address, this the 1st day of December, 2015.

/s/ Joshua D. Presley
**Joshua D. Presley**

37

## Certificate of Compliance

I hereby certify, pursuant to Rule 9.4(i)(2)(B) and Rule 9.4(i)(3) of the Texas Rules of Appellate procedure that the instant brief is computer-generated using Microsoft Word and said computer program has identified that there are 8,517 words within the portions of this brief required to be counted by Rule 9.4(i)(1) & (2) of the Texas Rules of Appellate Procedure.

The document was prepared in proportionally-spaced typeface using Times New Roman 14 for text and Times New Roman 12 for footnotes.

/s/ Joshua D. Presley
**Joshua D. Presley**